**FRINK AMERICA, INC., Plaintiff,**

v.

**CHAMPION ROAD MACHINERY LIMITED, Defendant.**

**CHAMPION ROAD MACHINERY LIMITED, Counter–Claimant,**

v.

**FRINK AMERICA, INC., Counter–Defendant.**

Nos. 96–CV–486, 96–CV–1576.

United States District Court, N.D. New York.

April 9, 1997.

19. *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

Bond, Schoeneck & King, L.L.P., Syracuse, NY, for Plaintiff; James R. Muldoon, of counsel.

Mackenzie Smith Lewis, Michell & Huges, L.L.P., Syracuse, NY, for Defendant; Nancy L. Pontius.

## MEMORANDUM, DECISION & ORDER

McAVOY, Chief Judge.

## I. BACKGROUND

### A. Facts:

*Corporate Evolution*

The common corporate lineage of the parties involved in this action dates back to 1945, when Melvin O. Simpson founded Combined Enterprises Limited, a holding company later to become known as Compro Limited ("Compro"). Compro eventually acquired three companies relevant to the present discussion. In 1958, Compro acquired Hamilton Gear and Machine Company ("Hamilton"), a manufacturer of industrial gearing. (Aff. of S. Paul Battaglia ["Battaglia Aff."], Ex. A at 1). Also in 1958, Compro purchased Eastern Steel Products ("Eastern"), located in Cambridge, Ontario. (*Id.;* Aff. of Mark Turpin ["Turpin Aff."] ¶ 1). In 1961, Compro purchased **plaintiff Frink America ("Frink America")**, a company headquartered in Clayton, New York and engaged in the manufacture of highway and airport snow plows in the United States. (Battaglia Aff., Ex. A at 1; Turpin Aff. ¶ 2). At the time Compro acquired Eastern, Eastern was manufacturing Frink snow plows in Canada, (*id.*), and in fact later became known as "Frink Canada."

In 1973, the Simpson family founded Melson Incorporated ("Melson"), a private Arizona corporation, fifty-percent of the stock of which was held by Simpson's son, Melvin Jr., and fifty-percent by the Dorothy C. Simpson Family Trust of Scottsdale, Arizona. (Battaglia Aff., Ex. A at 1). During the 1970's, Melson became the common owner of the outstanding stock of both Compro and Frink America. (*Id.;* Aff. of Louis Montante ["Montante Aff."] ¶ 3).

*The "Windrow" Plan*

By the early 1990's, Melson and its subsidiaries apparently began suffering considerable losses. In an effort to make Frink and Compro more competitive in the snow plow business, Melvin Sr. and his son Scott developed a plan ("Operation Windrow") that called for the combining of Compro and Frink America's manufacturing operations at one location in the United States. (Battaglia Aff. ¶ 8 and Ex. A at 4). Before this consolidation occurred, however, the continuing financial losses forced Melson to cease Frink America's operations in Clayton and shift all production to the Eastern (Frink Canada) facility in Cambridge. (Battaglia Aff. ¶ 9, Ex. A at 4; Turpin Aff. ¶ 3). As part of this move, in August of 1991, certain of Frink America's product drawings, plans, jigs, machine tools and other items (the "intellectual property") were transferred to the Eastern facility so that Frink Canada could satisfy Frink America's outstanding obligations. The legal consequences of this transfer are the focus of this proceeding.[1]

---

1. Plaintiff argues that
 all such intellectual property transferred by Frink to Frink Canada in and about August 1991 remained at all times the property of Frink. Frink never conveyed any ownership, title, or other legal or equitable interest in or to such intellectual property to Frink Canada when, in conjunction with the proposed relocation of Frink's manufacturing operations to a common facility, Frink gave temporary custo-

*The Bankruptcy Proceedings*

Compro's financial problems persisted, as did friction within the ranks of Melson and Compro's management. (Battaglia Aff. ¶ 11–12). As a result, defendant contends, Compro's chief financial backer, the Royal Bank of Canada (the "Royal Bank"), forced Compro into a Canadian bankruptcy proceeding sometime in late 1991. (*Id,* ¶ 11). Frink America followed suit in the summer of 1992 by filling for Chapter 11 protection in the Northern District of New York.

Prior to filing Chapter 11, however, Frink America's manufacturing operations were re-commenced at the Clayton facility. (*Id.;* Turpin Aff. ¶ 4). Thus, the intellectual property "loaned" to Frink Canada in connection with the failed Windrow operation was transferred from Cambridge back to the Clayton facility in June of 1992. (Battaglia Aff. ¶ 13, Ex. C; Turpin Aff. ¶ 5). This transfer additionally served a function in a larger scheme: since the Royal Bank actually was a creditor of both Compro and Frink America (Frink America having acted as guaranty on certain loans by the Royal Bank to Compro), the return of the intellectual property was part of an agreement[2] executed by the three parties which, plaintiff contends, was approved by the U.S. Bankruptcy Court in the Northern District. (Battaglia Aff. ¶ 15 and Ex. B).[3]

In October of 1992, Peat Marwick Thorne Inc. ("Peat Marwick") was appointed Compro's receiver in the Canadian bankruptcy proceeding. (Battaglia Aff. Ex. D at 1). Peat Marwick sold Compro's assets to 1004704 Ontario Inc., a corporation controlled by David Lowry. (*Id.;* Compl. ¶ 25). While Frink America was emerging from bankruptcy, Lowry transferred Compro's assets to an entity called Frink Environmental, Inc. ("FEI"), which the Royal Bank subsequently forced into bankruptcy in Canada. Ernst & Young Ltd. ("Ernst & Young") was appointed receiver of FEI in September of 1994. (Affidavit of Brian William Gray ["Gray Aff."] Ex. 1). Finally, as receiver, Ernst & Young sold FEI's assets to **defendant Champion Road Machinery Limited ("Champion")**; defendant allegedly came to possess the intellectual property of Frink America by way of this final transfer. (Gray Aff. Ex. 6).

*The Prior Lawsuit*

Plaintiff alleges that in 1995, Champion began manufacturing snow removal equipment with FEI's assets. Although Champion owns the rights to the Frink trademark in Canada, plaintiff contends that Champion began marketing snow removal equipment in the United States in direct competition with Frink America. (Pl. Mem. of Law at 8). These marketing efforts allegedly included distributing product catalogs and quotations to U.S. customers, and making unsupported claims to such customers that Frink America was in financial straits and would not be able to fill its warranty obligations. (*Id.*). In addition to the unlawful use of the Frink trademark, plaintiff alleges that equipment in the Champion product line was identical to the equipment previously manufactured exclusively by Frink America based upon American designs and plans. (*Id.*).

On June 8, 1995, plaintiff filed suit in the Ontario Court of Justice (General Division) against the Royal Bank and Champion. (Gray Aff. Ex. 10). The lawsuit sought injunctive relief against Champion for the use of plaintiff's intellectual property, and dam-

---

dy of such intellectual property to Frink Canada so that could it fill Frink's backlog of orders. (Compl.¶ 16).

**2.** Plaintiff alleges in its Complaint that despite this agreement, Frink Canada wrongfully retained and/or copied the intellectual property, including critical plans, drawings, blueprints, manuals, etc, for later use in competition with Frink America. (Compl.¶ 21;). Specifically, plaintiff alleges that

[a]lthough Compro returned Frink's original Equipment identified in the Agreement and the

June 9, 1992 letter, Compro did not transfer the copies of the engineering plans and drawings or the duplicate dies, jigs and patterns reproduced from Frink's equipment. Additionally, when Frink's own CAD system was returned, its memory containing the files of engineering drawings had been purged and erased. (Pl. Mem. of Law at 5).

**3.** Plaintiff also avers that this agreement was approved by the Ontario Court (General Division). (Battaglia Aff. ¶ 16).

ages against the Royal Bank for breach of contract, breach of confidentiality, conversion and breach of patent. (*Id.*). The parties subsequently consented to a dismissal of the action, (*id.* Ex. 14), but plaintiff contends that the dismissal was intended only against Royal Bank, and that Champion was dismissed as a defendant inadvertently. (*Id.* Ex. 15).

## B. Procedural History:

Plaintiff filed its first action in this Court on March 22, 1996 alleging, *inter alia*, trademark infringement. Plaintiff filed the present action on September 25, 1996. This Complaint contains five claims: (1) misappropriation of trade secrets and conversion; (2) tortious interference with business relations; (3) trade dress infringement; (4) unfair competition; and (5) copyright infringement under Canadian law. While the present motion was pending, the two actions were consolidated by Order of Magistrate Judge Daniel Scanlon, Jr. dated March 21, 1997.

Defendant filed this motion on December 23, 1996, and moves for dismissal of the member case on three grounds: (1) *forum non conveniens;* (2) failure to state a claim upon which relief may be granted, based upon the doctrine of international comity; and (3) failure to join a party, pursuant to Fed.R.Civ.P. 12(b)(7) and 19.

The Court will address these arguments *seriatim.*

## II. DISCUSSION

### A. *Forum Non Conveniens*

■ While the venue-transferring aspect of *forum non conveniens* has been superseded by statute, *see* 28 U.S.C. § 1404(a), federal courts nonetheless retain the power to dismiss actions for damages under common-law application of the doctrine where the alternative forum is abroad. *Quackenbush v. Allstate Ins. Co.,* —— U.S. ——, ——, 116 S.Ct. 1712, 1724, 135 L.Ed.2d 1 (1996) (citing *American Dredging Co. v. Miller,* 510 U.S. 443, 449, n. 2, 114 S.Ct. 981, 986, n. 2, 127 L.Ed.2d 285 (1994)). Defendant invokes this facet of the doctrine on the present motion.

■ A district court has broad discretion in determining whether to dismiss an action on *forum non conveniens* grounds. *See Piper Aircraft v. Reyno,* 454 U.S. 235, 257, 102 S.Ct. 252, 266–67, 70 L.Ed.2d 419 (1981). Making the determination involves a three step analysis. First, "as a threshold matter, [the Court] must examine the availability of an alternate forum." *Nationsbank of Florida v. Banco Exterior de Espana,* 867 F.Supp. 167, 169 (S.D.N.Y.1994) (citing *Gulf Oil v. Gilbert,* 330 U.S. 501, 506–07, 67 S.Ct. 839, 842, 91 L.Ed. 1055 (1947)). Second, the plaintiff's choice of forum is considered. *Nationsbank,* 867 F.Supp. at 169–70 (citing *Piper Aircraft,* 454 U.S. at 241, 102 S.Ct. at 258). Finally, the Court must perform a balancing test that weighs both "private interest factors" affecting the convenience of the litigants, and "public interest factors" affecting the convenience of the forum and the interests of justice. *Gulf Oil,* 330 U.S. at 508–509, 67 S.Ct. at 843; *Blanco v. Banco Industrial de Venezuela,S.A.,* 997 F.2d 974 (2d Cir. 1993); *Travelers Indem. Co. v. S/S Alca,* 710 F.Supp. 497, 500 (S.D.N.Y.1989), *aff'd without opinion,* 895 F.2d 1410 (2d Cir.1989).

■ Turning to the first issue, defendant proposes as an alternate forum a Canadian court. Although defendant does not expressly concede as much, the Court presumes that, as a Canadian corporation, defendant is amenable to service of process in Canada. Thus, the alternate forum is both available and adequate. *See, e.g., Murray v. British Broadcasting Corp.,* 81 F.3d 287, 292 (2d Cir.1996) ("The requirement of an alternative forum is ordinarily satisfied if the defendant is amenable to process in another jurisdiction ...."); *Nationsbank,* 867 F.Supp. at 170 (same).

■ Plaintiff, however, has chosen New York as its forum. Ordinarily, there is a strong presumption in favor of the plaintiff's selection of a forum which may be overcome only when the private and public factors clearly point toward trial in the alternative forum. *Piper,* 454 U.S. at 255, 102 S.Ct. at 265–66. This rule is based upon the logical assumption that the plaintiff's home forum is in fact the most convenient. *Id.* at 256, 102

S.Ct. at 266. We thus turn to the private/public interest balancing test of *Gilbert*.[4]

**Private Interests**

■ The factors pertaining to the private interests of the litigants include: the "relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Gilbert*, 330 U.S. at 508, 67 S.Ct. at 843; *see also Borden Inc. v. Meiji Milk Products Co.*, 919 F.2d 822, 827 (2d Cir.1990). "There may also be questions as to the enforcibility [sic] of a judgment if one is obtained ...". *Gilbert*, 330 U.S. at 508, 67 S.Ct. at 843.

> Defendant argues generally that
> the dispute involves a Canadian bankruptcy proceeding. It involves assets located in Canada and the transfer of those assets from one Canadian company to another Canadian company, pursuant to a specific order of a Canadian Court. All the potential defendants reside in Canada: 1) Champion; 2) the bankruptcy petitioner, the Royal Bank; and 3) the bankruptcy trustee, Ernst & Young. Thus, the proper forum is clearly Canada.

(Def. Mem. of Law at 10). Defendant's emphasis on the Canadian bankruptcy proceeding, however, is steeped in misdirection. While the transfer of assets by Ernst & Young from FEI to defendant is a relevant transaction, a transaction of equal, if not greater significance is Frink America's transfer of intellectual property to Eastern in August of 1991, a transfer that originated in this very district. Moreover, as plaintiff points out, it will need to prove that certain of the drawings, plans, etc. were the products of Frink America employees, many of whom may still reside in the district. Such witnesses would not be subject to compulsory process in a Canadian action.[5]

Other private interest factors weighing in plaintiff's favor are the relative proximity of the likely locations of much of the discovery material, and the situs of much of the conduct in question. While Upstate New York and Southern Ontario undoubtedly retain distinct provincial and national identities, this Court is uniquely aware that our neighbors to the North (and West) are, if not a stone's throw, at most a few hours' drive away. Indeed, there are points within the district as separated. Moreover, considerations of practical convenience must be evaluated "in light of the increased speed of travel and communication which makes ... no forum 'as inconvenient [today] as it was in 1947.'" *Manu Intern., S.A., v. Avon Products, Inc.*, 641 F.2d 62, 65 (2d Cir.1981) (quoting *Fitzgerald v. Texaco, Inc.*, 521 F.2d 448, 457 (2d Cir.1975)). Additionally, the very conduct upon which several of plaintiff's claims are premised, namely defendant's marketing, distribution and sales activities, occurred within the United States. Indeed, the *situs* of much of the conduct is a crucial issue, since plaintiff concedes that defendant owns the rights to the Frink trademark in Canada.

Defendant argues that since plaintiff seeks an injunction regarding acts of both defendant and non-parties taking place in Canada, this Court lacks the power to fashion a complete remedy in the event it finds in plaintiff's favor. Given that injunctive relief rests in the Court's discretion, however, such relief may be denied if this Court determines that an injunction would be unenforceable. *See, e.g., Panama Processes, S.A., v. Cities Service Co.*, 650 F.2d 408, 420 (2d Cir.1981) (Maletz, J., dissenting); *cf. Creative Technology, Ltd. v. Aztech System Pte, Ltd.*, 61 F.3d 696, 702 (9th Cir.1995) (noting that rem-

---

4. "In weighing the *Gilbert* factors, the court starts with a presumption in favor of the plaintiff's choice of forum ... The defendant has the burden of overcoming this presumption by establishing that the *Gilbert* factors 'tilt[ ] strongly in favor of' the alternative forum." *Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 46 (2d Cir.1996) (quoting *Schertenleib v. Traum*, 589 F.2d 1156, 1160 (2d Cir.1978)).

5. On the other hand, defendant argues that "it is much more likely that non-party Canadian witnesses, and in particular person who participated in the Canadian bankruptcy proceedings, will be the crucial witnesses in this case." (Def. Reply Mem. at 6). Once again, however, this argument assumes that the Canadian bankruptcy proceedings are the crux of this case.

edies available in alternative forum were "not 'so clearly inadequate or unsatisfactory that [there was] no remedy at all.'") (quoting *Piper*, 454 U.S. at 254, 102 S.Ct. at 265).

### Public Interest

■ The public interest factors include: the administrative difficulties flowing from court congestion; the "local interest in having localized controversies decided at home;" the interest of having the trial of a case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty. *Gilbert*, 330 U.S. at 509, 67 S.Ct. at 843.

Defendant makes no argument with respect to the first factor. As to the second, defendant posits that "copyright adjudications ... are matters of fundamentally local concern." (Def. Reply Mem. at 4). This argument ignores the fact that four of plaintiff's five claims are brought under American law.

■ This recognition brings us to the heart of the controversy embodied in the next two factors, namely whether trial of this action in this forum will require the Court to become enmeshed in matters of Canadian law. At the outset, we note that while the difficulties attendant in resolving questions of foreign law are a proper consideration, *see Scottish Air International, Inc. v. British Caledonian Group PLC*, 81 F.3d 1224, 1234 (2d Cir.1996), " 'it is well-established that the need to apply foreign law is not alone sufficient to dismiss under the doctrine of *forum non conveniens*.' " *Segal*, 89 F.3d at 47 (quoting *R. Maganlal & Co. v. M.G. Chemical Co., Inc.*, 942 F.2d 164, 169 (2d Cir.1991)). Ultimately, this Court cannot conclude, as does defendant, that plaintiff's claims under American copyright and common-law are simply "a smokescreen for its improper Canadian copyright claim." (Def. Reply Mem. at 4). Nor does defendant convincingly argue that the necessity of adjudicating the Canadian claim militates in favor of dismissal on *forum non conveniens* grounds.

Defendant does, however, raise serious questions as to this Court's *power* to hear such a claim, i.e., whether a federal district court has subject matter jurisdiction over a foreign copyright claim. In *Vanity Fair Mills, Inc. v. T. Eaton, Ltd.*, 234 F.2d 633 (2d Cir.1956), the Second Circuit upheld a district court's decision declining to exercise jurisdiction of claims of trademark infringement and unfair competition arising in Canada under Canadian law, noting:

> We do not think it the province of United States district courts to determine the validity of trademarks which officials of foreign countries have seen fit to grant. To do so would be to welcome conflicts with the administrative and judicial officers of the Dominion Canada.

*Id.* at 647. A copyright claim such as that presented here is distinguishable, however, as the Southern District noted in *London Film Productions v. Intercontinental Comm.*, 580 F.Supp. 47, 49 (S.D.N.Y.1984):

> '[i]n adjudicating an infringement action under a foreign copyright law there is ... no need to pass upon the validity of acts of foreign government officials,' since foreign copyright laws, by and large, do not incorporate administrative formalities which must be satisfied to create or perfect a copyright.

*Id.* at 49 (quoting 3 *Nimmer on Copyright*, § 1703 (1983)) (internal citations omitted).

In opposition, defendant cites *ITSI T.V. Productions, Inc. v. California Authority of Racing Fairs*, 785 F.Supp. 854 (E.D.Cal. 1992), a case that declined the exercise of jurisdiction over copyright claims arising under Mexican law, noting that Professor Nimmer's general proposition regarding the lack of administrative formalities necessary to perfect a copyright "does not answer the question whether in any given case the particular foreign law does have administrative formalities which must be satisfied." *Id.* at 866 n. 19. As Professor Nimmer later noted, however, this objection need not detain us, since "administrative formalities are barred in all nations that adhere to the Berne Convention," 3 *Nimmer on Copyright*, § 17.03 (1996), a convention to which Canada has been a signatory since 1928. *Id.*, App. 22–2.

Thus, defendant's objections to this Court's subject matter jurisdiction are without merit.

In summary, defendant has not shown that the relevant interests tilt so strongly in its favor as to overcome the strong presumption in favor of plaintiff's choice of forum. *See Peregrine,* 89 F.3d at 46; *Schertenleib,* 589 F.2d at 1160. Thus, defendant's motion to dismiss for *forum non conveniens* is denied.

## B. Fed.R.Civ.P. 12(b)(6)/Comity

■ Defendant also argues that under the doctrine of comity, plaintiff fails to state a claim upon which relief may be granted. Specifically relying on *Clarkson Co., Ltd. v. Shaheen,* 544 F.2d 624 (2d Cir.1976), defendant argues that "[i]n this case, Frink America is collaterally attacking the Canadian bankruptcy proceeding, and the authority of the Canadian bankruptcy to transfer assets under a Canadian Court Order." (Def. Mem. of Law at 12). Once again, however, defendant mischaracterizes the theory behind plaintiff's claims. While considerations of comity certainly would militate against any collateral attack on the Canadian bankruptcy proceedings, see *Clarkson,* 544 F.2d at 629, the Court is unconvinced that plaintiff's case stands or falls on the validity of those proceedings. Rather, as plaintiff asserts, "the Complaint in this action emanates from Compro's failure to and breach of its Agreement to, return the intellectual property ... lent to it by Frink in 1991." (Battaglia Aff. ¶ 19).

The Ontario Court order approving the purchase by Champion from FEI of "certain of the assets" of FEI noted that the transfer was free and clear of claims by certain parties, but plaintiff was not among those listed. Moreover, the purchase agreement itself listed the intellectual property that was part of the transfer. (Gray Aff. Ex. 6 [Schedule "E"]). As plaintiff points out, the intellectual property transferred included only four Canadian patents, one lapsed U.S. patent and three Canadian trademarks; any intellectual property not included in Schedule "E" was specifically excluded. (*Id.*). Assuming that the items listed in Schedule "E" are not at

issue in this lawsuit, the intellectual property in controversy here was not even *ostensibly* transferred by virtue of the Champion purchase. Thus, neither the validity of the Canadian Bankruptcy Order, nor the trustee's "authority" to transfer the assets listed in the agreement are implicated. For these reasons, defendants motion to dismiss under Fed. R.Civ. P. 12(b)(6) is denied.[6]

## C. Failure to Join a Necessary Party

Finally, defendant argues that because plaintiff alleges a conspiracy between the Royal Bank and defendant to deprive plaintiff of the intellectual property at issue, the Royal Bank (and possibly Ernst & Young, the trustee) should have been joined in this action.

Defendant's analysis, however, is incomplete. Rule 12(b)(7) lists, as a ground for dismissal, "failure to join a party under Rule 19." Rule 19 in turn provides a two-step process to determine whether an action may proceed in a party's absence. Rule 19(a) first provides that a person subject to service of process "whose joinder will not deprive the court of subject matter jurisdiction" must be joined (1) if full relief may not be granted among those already parties in the person's absence; or (2) if the person has an interest in the subject matter of the action, and disposition of the action in that person's absence would either impede the person's ability to protect that interest, or leave the original parties subject to multiple or inconsistent obligations. Fed.R.Civ.P. 19(a).

Second, if the person is determined to be a "necessary" party under Rule 19(a) but cannot be joined (either because they not amenable to service of process or would deprive the court of subject matter jurisdiction), the Court must determine whether the person is "indispensable," i.e., whether the action must be dismissed due to the person's absence. *Id.; see generally* 7 CHARLES A. WRIGHT, ARTHUR R. MILLER, AND MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE, § 1604 at 41 (1986) ("By proceeding in this orderly

---

6. Defendant also makes passing mention of *res judicata* as a basis for dismissal of plaintiff's Complaint. Since, however, defendant provides

no legal or factual support for this argument, the Court declines to address the issue.

fashion the court will be able to avoid grappling with the difficult question of indispensability whenever it initially decides that the absentee's interest is not sufficient to warrant compelling his joinder."). In making this determination, the factors to be considered include:

first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

Fed.R.Civ.P. 19(b).

 Defendant has failed, as a threshold matter, to establish that either the Royal Bank or Ernst & Young is a necessary party under Rule 19(a). Defendant merely argues that since plaintiff may have settled with the Royal Bank, such a settlement may provide defendant with a defense. Defendant fails, however, to establish that the Royal Bank has any interest in the subject matter of this action, or that complete relief may not be accorded among the parties in the Royal Bank's absence.[7] Furthermore, it is well-established that under federal law, neither joint tortfeasors nor co-conspirators are indispensable parties. *See State of Georgia v. Pennsylvania R. Co.*, 324 U.S. 439, 463, 65 S.Ct. 716, 728–29, 89 L.Ed. 1051 (1945); *Bomar Resources, Inc. v. Sierra Rutile Ltd.*, 1991 WL 4544, at *6 (S.D.N.Y.1991) (citing *Samaha v. Presbyterian Hosp.*, 757 F.2d 529, 531 (2d Cir.1985)). Therefore, defendant's motion to dismiss for failure to join a party under Rule 19 is denied.

### III. CONCLUSION:

For all of the foregoing reasons, then, it is hereby

ORDERED, that defendant's motion to dismiss is denied on all grounds.

**IT IS SO ORDERED.**

---

7. We further note that even if plaintiff established the necessity of joining these parties under Rule 19(a), the next step would be to join these parties, if feasible. Defendant ignores this possibility entirely, arguing only that since these parties are necessary and have not been joined as of yet, the action must be dismissed.