FRINK AMERICA, INC., Plaintiff,

v.

CHAMPION ROAD MACHINERY
LIMITED, Defendant.

Champion Road Machinery Limited,
Counter–Claimant,

v.

Frink America, Inc.; and David Lowry,
Counter–Defendants.

Frink America, Inc., Plaintiff,

v.

Champion Road Machinery
Limited, Defendant.

Nos. 96–CV–486, 96–CV–1576.

United States District Court,
N.D. New York.

May 11, 1999.

Harris Beach & Wilcox, LLP, Rochester, NY (Neal Slifkin, of counsel), for Plaintiff.

Fish & Richardson, P.C., Boston, MA (Lawrence Kolodney, of counsel).

MacKenzie Smith Law Firm, Syracuse, NY (Nancy Pontius, of counsel), for Defendant.

## MEMORANDUM–DECISION & ORDER

McAVOY, Chief Judge.

## I. BACKGROUND

### A. Corporate Evolution

To the extent relevant, facts detailed in the Court's prior decision in *Frink America, Inc. v. Champion Road Machinery Ltd.*, 961 F.Supp. 398 (N.D.N.Y.1997) are also presented below.

The common corporate lineage of the parties involved in this action dates back to 1945, when Melvin O. Simpson founded Combined Enterprises Limited, a holding company later to become known as Compro Limited ("Compro"). Compro later acquired two companies relevant to the present discussion. In 1958, Compro purchased Eastern Steel Products ("Eastern"), located in Cambridge, Ontario. In 1961, Compro purchased plaintiff Frink America ("Frink America"), a company headquartered in Clayton, New York and engaged in the manufacture of highway and airport snow plows in the United States. At the time Compro acquired Eastern, Eastern was manufacturing the Frink snowplow product line in Canada under license from Frink, and in fact later became known as "Frink Canada."

In 1973, the Simpson family founded Melson Incorporated ("Melson"), a private Arizona holding company, fifty-percent of the stock of which was held by Simpson's son, Melvin Jr., and fifty-percent by the Dorothy C. Simpson Family Trust of Scottsdale, Arizona. By 1980, Melson purchased the outstanding stock of Compro, and thereby controlled Compro, Eastern (Frink Canada) and Frink America. Accordingly, Frink America and Frink Canada were essentially two divisions of the same organization.

## B. The "Windrow" Plan

By the early 1990s, Melson and its subsidiaries apparently began suffering considerable losses. In an effort to make Frink America and Compro more competitive in the snow plow business, Melson developed a plan, "Operation Windrow," that called for the combining of Compro and Frink America's manufacturing operations at one location in the United States. Before this consolidation occurred, however, the continuing financial losses forced Melson to cease Frink America's operations in Clayton and shift all production to the Eastern (Frink Canada) facility in Cambridge. As part of this move, in August 1991, certain of Frink America's manufacturing plans, product drawings, jigs, dies, machine tools, technical manuals and other items (collectively the "intellectual property") were transferred to the Eastern facility so that Frink Canada could satisfy Frink America's outstanding obligations. The legal consequences of this transfer are the focus of defendant's present motion.[1]

By 1992, Frink America's manufacturing operations had been fully integrated into Frink Canada's operations at its Cambridge plant in Canada. Melson's plan to consolidate the manufacturing operations of Compro and Frink America to one facility in the United States was abandoned, and Melson decided to renew Frink America's operations at its Clayton, New York facility.

## C. The Bankruptcy Proceedings

Compro's financial problems persisted, as did friction within the ranks of Melson and Compro's management. As a result, Compro's chief financial backer, the Royal Bank of Canada (the "Royal Bank"), forced Compro into a Canadian bankruptcy proceeding sometime in 1992. At the same time, Frink America filed for protection under Chapter 11 of the Bankruptcy Code in the Northern District of New York.

Prior to filing Chapter 11, however, Frink America's manufacturing operations were recommenced at the Clayton facility. Thus, the intellectual property "loaned" to Frink Canada in connection with the failed Windrow operation was transferred from Cambridge back to the Clayton facility in June of 1992. While defendant acknowledges that copies of drawings were retained by Frink Canada to complete orders on which it had been working, plaintiff alleges that defendant also retained jigs, fixtures and copies of drawings on its computer system. This transfer additionally served a function in a larger scheme: since the Royal Bank actually was a creditor of both Compro and Frink America (Frink America having acted as guaranty on certain loans by the Royal Bank to Compro), the return of the intellectual property was part of an agreement[2] executed by the three parties which, plaintiff contends, was approved by the U.S. Bankruptcy Court in the Northern District and Ontario Court of Justice. The agreement further provided that "Compro would not replicate or retain any copies of any item belonging to Frink [America] or disseminate or deliver any copies to any other party other than Frink [America]." Amended Compl. at ¶ 24.

---

1. Plaintiff argues that
   All such intellectual property transferred by Frink [America] to Frink Canada in and about August 1991 remained at all times the property of Frink [America]. Frink [America] never conveyed any ownership, title, or other legal or equitable interest in or to such intellectual property to Frink Canada when, in conjunction with the proposed relocation of Frink [America's] manufacturing operations to a common facility, Frink [America] gave temporary custody of

such intellectual property to Frink Canada so that could it fill Frink [America's] backlog of orders.
Amended Compl. at ¶ 16.

2. Plaintiff alleges in its Complaint that despite this agreement, Frink Canada wrongfully retained and/or copied the intellectual property, including critical plans, drawings, blueprints, manuals, etc, for later use in competition with Frink America. *See* Amended Compl. at ¶ 21.

In October of 1992, Peat Marwick Thorne, Inc. ("Peat Marwick") was appointed Compro's receiver in the Canadian bankruptcy proceeding. Peat Marwick sold Compro's assets to 1004704 Ontario Inc , a corporation controlled by David Lowry ("Lowry").[3] While Frink America was emerging from bankruptcy, Lowry transferred Compro's assets to an entity called Frink Environmental, Inc. ("FEI"), serving as its president and chief executive officer. During the time Lowry controlled both Frink America and FEI, Lowry maintained copies of all of Frink America's engineering drawings at FEI's Cambridge facility.

In September 1992, Royal Bank forced FEI into bankruptcy in Canada, and Ernst & Young Ltd. ("Ernst & Young") was appointed receiver of FEI in September 1994. Ernst & Young subsequently sold FEI's assets to defendant Champion Road Machinery Ltd. ("defendant" or "Champion"). Accordingly, defendant allegedly came to possess the intellectual property of Frink America by way of this final transfer. Relevant to the parties' dispute is whether Lowry made an effort to prevent Champion from retaining copies of Frink America engineering drawings located at FEI's Cambridge facility, or informed Champion that intellectual property belonging to Frink America was in possession of FEI.[4]

## D. Post–Bankruptcy Events

On or about January 1995, Champion began manufacturing snow removal equipment at the Cambridge facility formerly owned by FEI. Defendant acknowledges that while its purchase of FEI's assets provided it with the right to use the FRINK trademark in Canada, it did not possess the right to use the FRINK trademark in the United States. See Deft. 7.1 Stat. at ¶ 32. Defendant alleges that it "was always Champion's policy to use the CHAMPION trademark when selling snow removal equipment in the United States." Id. In 1996, Champion decided to phase out its use of the FRINK trademark and sell its snowplows in Canada exclusively under the CHAMPION trademark. See id. During this time, however, defendant discovered that old FEI literature bearing the FRINK trademark "was inadvertently sent to Champion's United States dealers by an employee of Champion's sales department." Id. Defendant contends, and plaintiff does not dispute, that Champion took "immediate steps to insure that the material was either returned to Champion or destroyed." Id.; see also Pl. 7.1 Stat. at ¶ 32. The parties disagree, however, on whether Frink America customers relied on the FEI literature bearing the FRINK trademark when purchasing snowplow equipment from defendant.

Plaintiff argues that Champion began marketing snow removal equipment in the United States in direct competition with Frink America. Specifically, plaintiff alleges that Champion's distribution in the United States of FEI sales catalogs and sales invoices bearing the FRINK trademark "in connection with the sale of plows identical to Frink America's create[d] a

---

3. Plaintiff does not dispute defendant's assertion that the assets purchased from Compro included:

> "all assignable trade secrets, research data, designs, proprietary know-how, technical information, specifications and materials in whatever form or media recording or evidencing technology or proprietary information used in or relating to" Compro's business, and all of Compro's intellectual property, including trademarks and copyrights.

Deft. 7.1 Stat. at ¶ 13.

4. Defendant further alleges that the assets purchased from Ernst & Young included " 'inventories, component parts, packaging and finished goods' as well as customer lists, engineering drawings and business records'.... and 'an assignment of FEI's right to use the "Frink" trademark in Canada.' " Deft. 7.1 Stat. at ¶ 26. In response, plaintiff argues that the agreement only covered those assets in which the vendor (FEI) had a "right, title and interest," and not all assets in FEI's possession at the time of sale. See Pl. 7.1 Stat. at ¶ 26.

presumption of confusion." Pl. 7.1 Stat. at ¶ 43; Pl. Mem. of Law at 13–14. In addition to the unlawful use of the FRINK trademark, plaintiff alleges that equipment in the Champion product line was identical to the equipment previously manufactured exclusively by Frink America based upon the American designs and plans.[5] Thus, plaintiff contends that Champion "was selling plows identical to Frink America's plows and was using the [FRINK] trademark to do so." Pl. Mem. of Law at 14.

After experiencing losses in 1995 and 1996 from its sales of snow removal equipment, Champion decided to cease operations in its snow removal equipment business and, shortly thereafter, sold those assets to Cives Corporation, a direct competitor of Frink America in the United States.

### E. Procedural History

Plaintiff Frink America filed its first action in this Court on March 22, 1996 alleging, inter alia, trademark infringement and dilution. In its Answer, defendant asserted a single counterclaim against plaintiff, seeking cancellation of Frink America's registration of the "Rollover" mark. Plaintiff filed a second action against defendant on September 25, 1996 alleging: (1) misappropriation of trade secrets and conversion; (2) tortious interference with business relations; (3) trade dress infringement; (4) unfair competition under applicable federal and state law; and (5) copyright infringement under Canadian law. Plaintiff filed an Amended Complaint on October 29, 1997, adding an additional claim for breach of contract. In its Answer, defendant asserted counterclaims against Frink America and its president, Lowry, for patent and copyright infringement, misappropriation of trade secrets and conversion, and unfair competition. In an order dated March 21, 1997, the Magistrate Judge consolidated the two actions.

On December 23, 1996, defendant moved for dismissal of the second action based on three grounds: (1) *forum non conveniens;* (2) failure to state a claim upon which relief may be granted, based upon the doctrine of international comity; and (3) failure to join a party, pursuant to FED. R. CIV. P. 12(b)(7) and 19. In a Memorandum–Decision & Order dated April 8, 1997, this Court denied defendant's motion in its entirety. *See Frink America, Inc.,* 961 F.Supp. at 406.

Presently before the Court is defendant Champion's motion for summary judgment with respect to all claims asserted by plaintiff. *See* Deft. Notice of Motion at 1.

## II. Discussion

### A. The Standard for Summary Judgment

The standard for summary judgment is well-settled. Under FED. R. CIV. P. 56(c), if there is "no genuine issue as to any material fact ... the moving party is entitled to a judgment as a matter of law ... where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Chertkova v. Connecticut Gen. Life Ins. Co.,* 92 F.3d 81, 86 (1996). The moving party bears the initial burden of "informing the ... court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, to-

---

5. Although the parties agree that "it is not an uncommon practice in the snowplow industry to copy the designs of a competitor's snowplows by taking measurements of the snowplows," Deft. 7.1 Stat. at ¶ 37, plaintiff contends that such a process could take "as long as several months or even a year." Pl. 7.1 Stat. at ¶ 1 (additional material facts in dispute). Plaintiff argues that defendant's alleged improper retention of Frink America designs and plans provided Champion with an unfair advantage over Frink America and its other competitors by being able to "quickly and inexpensively offer snowplows identical to Frink America's plows." *Id.* at ¶ 4.

gether with affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting FED. R. CIV. P. 56(c)). The initial burden is to demonstrate "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548.

Once the moving party has met its burden, the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *See Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548; *Matsushita,* 475 U.S. at 585–86, 106 S.Ct. 1348. A dispute regarding a material fact is genuine if a reasonable jury could return a verdict for the non-moving party; that is, whether the non-movant's case, if proved at trial, would be sufficient to survive a motion for judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250–51, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When reasonable minds, however, could not differ as to the import of the evidence, then summary judgment is proper. *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

Although the trial court must resolve all ambiguities and draw all inferences in favor of that party against whom summary judgment is sought, *Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 465 (2d Cir.1989); *Eastway Constr. Corp. v. City of New York,* 762 F.2d 243, 249 (2d Cir. 1985) *cert. denied,* 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987), the motion will not be defeated by a non-movant who raises merely a "metaphysical doubt" concerning the facts or who only offers conjecture or surmise. *Delaware & H.R. Co. v. Consolidated Rail Corp.,* 902 F.2d 174, 178 (2d Cir.1990), *cert. denied,* 500 U.S. 928, 111 S.Ct. 2041, 114 L.Ed.2d 125 (1991) (quoting *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348); *see also Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir. 1990). Indeed, the nonmoving party's op-

position may not rest on mere allegations or denials of the moving party's pleading, but "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e).

Because plaintiff "concedes that it cannot prove copyright infringement, trade dress infringement and breach of contract," Pl. Mem. of Law at 6, those claims are dismissed. Thus, the Court will address plaintiff's remaining claims for misappropriation of trade secrets, conversion, trademark infringement and dilution, unfair competition, and tortious interference with business relations.

## B. Misappropriation of Trade Secrets Claim

As a threshold matter, the Court must determine whether New York or Canadian law applies to plaintiff's misappropriation of trade secrets claim.

■ A federal court sitting in diversity must apply the choice of law rules of the forum state, in this case New York. *See Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1538–39 (2d Cir.) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)), *cert. denied,* —— U.S. ——, 118 S.Ct. 169, 139 L.Ed.2d 112 (1997). Thus, the Court must examine New York's choice of law rule in tort cases.

■ Historically, New York courts employed a "traditional, 'territorially oriented' approach to choice-of-law issues which applied the law of the geographical place where one key event occurred, such as the place of the wrong in tort cases." *Brink's Ltd. v. South African Airways,* 93 F.3d 1022, 1030 (2d Cir.1996) (quoting *Istim, Inc. v. Chemical Bank,* 78 N.Y.2d 342, 347, 575 N.Y.S.2d 796, 581 N.E.2d 1042 (1991)), *cert. denied,* 519 U.S. 1116, 117 S.Ct. 959, 136 L.Ed.2d 845 (1997). More recently, however, New York courts, recognizing that "[a] State may lack sufficient nexus with a case so that choice of its law is

arbitrary or fundamentally unfair," have adopted a more flexible approach in analyzing choice of law questions. *Id.* (quoting *Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 70–71, 595 N.Y.S.2d 919, 612 N.E.2d 277 (1993)). "Under this more flexible approach, New York courts seek to apply the law of the jurisdiction with the most significant interest in, or relationship to, the dispute." *Id.* (citing *Babcock v. Jackson*, 12 N.Y.2d 473, 481–82, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963)); *see also Lazard Freres & Co.*, 108 F.3d at 1539.

In tort cases, New York courts have adopted an "interest analysis" to determine which of the two competing jurisdictions has a "greater interest in having its law applied in the litigation." *Ackerman v. Price Waterhouse*, 252 A.D.2d 179, 683 N.Y.S.2d 179, 188 (1st Dep't 1998); *see also Lazard Freres & Co.*, 108 F.3d at 1539 n. 5 (citing *Schultz v. Boy Scouts of Am., Inc.*, 65 N.Y.2d 189, 197, 491 N.Y.S.2d 90, 480 N.E.2d 679 (1985)); *Elgin Sweeper Co. v. Melson, Inc.*, 884 F.Supp. 641, 650 n. 12 (N.D.N.Y.1995) (Scullin, J.) ("[T]he choice of law for tort causes of action is based upon the place which has the most significant contacts with the matter in dispute, thereby giving the place with the most interest in the problem paramount control over the legal issues arising in the case."). Under this approach, "the significant contacts are, almost exclusively, the parties' domiciles and the locus of the tort." *Schultz*, 65 N.Y.2d at 197, 491 N.Y.S.2d 90, 480 N.E.2d 679; *see also Ackerman*, 683 N.Y.S.2d at 188 (" 'The greater interest is determined by an evaluation of the 'facts or contacts which . . . relate to the purpose of the particular law in conflict.' ") (quoting *Padula v. Lilarn Properties Corp.*, 84 N.Y.2d 519, 521, 620 N.Y.S.2d 310, 644 N.E.2d 1001 (1994)).

■ Where the laws alleged to be in conflict regulate conduct, " 'the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders.' " *Ackerman*, 683 N.Y.S.2d at 189 (quoting *Cooney*, 81 N.Y.2d at 72, 595 N.Y.S.2d 919, 612 N.E.2d 277); *see also Padula*, 84 N.Y.2d at 522, 620 N.Y.S.2d 310, 644 N.E.2d 1001. However, when "the defendant's . . . conduct occurs in one jurisdiction and the plaintiff's injuries are suffered in *another*, the place of the wrong is considered to be the place where the last event necessary to make the actor liable occurred." *Schultz*, 65 N.Y.2d at 195, 491 N.Y.S.2d 90, 480 N.E.2d 679 (emphasis added). Thus, the place of occurrence of the tort will be "where the plaintiff suffered the injury sued upon." *Ackerman*, 683 N.Y.S.2d at 189 (in accountants liability case, apply New York law because "the place of injury is New York since that is where the New York plaintiffs felt the economic injury of the IRS's disallowance of the tax deductions"); *see also Schultz*, 65 N.Y.2d at 195, 491 N.Y.S.2d 90, 480 N.E.2d 679 ("[T]he locus in [a tort] case is determined by where the plaintiffs' injuries occurred.").

■ In the present case, although the alleged misappropriation of plaintiff's trade secrets—engineering designs, plans and drawings for the Frink America snowplow—occurred in Canada, any injuries suffered by plaintiff based on defendant's use of its trade secrets were felt in New York when defendant, using those trade secrets, introduced a similar product in the United States in direct competition with plaintiff. Indeed, it was defendant's entry into the New York economy and targeting of New York consumers that caused an injury to plaintiff in the form of lost profits. Because plaintiff is domiciled in New York, and its injuries occurred in New York, the Court finds that New York has the greater interest in having its law applied to plaintiff's claim that defendant misappropriated its trade secrets.[6]

6. Although defendant contends that Canadian law should be applied to plaintiff's misappro-

priation of trade secrets claim, it acknowledges that the law in Canada is similar to that

206

To recover under New York law for the misappropriation of a trade secret, the plaintiff must demonstrate "(i) that it possessed a trade secret and (ii) that the defendant used that trade secret in breach of an agreement, a confidential relationship, or duty, or as a result of discovery by improper means." *Hudson Hotels Corp. v. Choice Hotels Int'l*, 995 F.2d 1173, 1176 (2d Cir.1993); *see also Integrated Cash Management Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir. 1990); *Anacomp, Inc. v. Shell Knob Servs., Inc.*, 1994 WL 9681, at * 6 (S.D.N.Y. Jan.10, 1994).

New York generally looks to section 757 of the first Restatement of Torts for its definition of a trade secret. *See Softel, Inc. v. Dragon Med. and Scientific Communications, Inc.*, 118 F.3d 955, 968 (2d Cir.1997) (citing *Ashland Management Inc. v. Janien*, 82 N.Y.2d 395, 407, 604 N.Y.S.2d 912, 624 N.E.2d 1007 (1993)), *cert. denied*, —— U.S.——, 118 S.Ct. 1300, 140 L.Ed.2d 466 (1998). Under this definition, a trade secret is " 'any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.' " *Id.* (quoting RESTATEMENT OF TORTS § 757 cmt. b, at 5 (1939)); *see also Hudson Hotels Corp.*, 995 F.2d at 1176 (adopting Restatement definition); *Ashland*, 82 N.Y.2d at 407, 604 N.Y.S.2d 912, 624 N.E.2d 1007. The Restatement further provides that a trade secret " 'is not simply information as to single or ephemeral events in the conduct of the business'; rather, it 'is a process or device for continuous use in the operation of the business.' " *Softel, Inc.*, 118 F.3d at 968 (quoting RESTATEMENT OF TORTS § 757 cmt. b, at 5); *see also Richter v. Westab, Inc.*, 529 F.2d 896, 900 (6th Cir.1976) ("Generally [a trade secret] relates to the production of goods, as, for example, a machine or formula for the production of an article.") (citing RESTATEMENT OF TORTS § 257 cmt.

b). Trade secret status does not include, however, " 'a marketing concept or new product idea' submitted by one party to another." *Hudson Hotels, Corp.*, 995 F.2d at 1176 (quoting 2 R. MILGRIM, MILGRIM ON TRADE SECRETS § 8.03, at 8–31 (1992 & Supp.1992)).

In *Hudson Hotels*, the Second Circuit outlined the several factors that may be considered in determining whether a plaintiff possessed a trade secret:

(1) the extent to which the information is known outside of [plaintiff's] business; (2) the extent to which it is known by employees and others involved in [plaintiff's] business; (3) the extent of measures taken by [plaintiff] to guard the secrecy of the information; (4) the value of the information to [plaintiff] and to his competitors; (5) the amount of effort or money expended by [plaintiff] in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

995 F.2d at 1176 n. 1 (citing RESTATEMENT OF TORTS § 757 cmt. b); *see also Integrated Cash Management Servs., Inc.*, 920 F.2d at 173. "An essential requisite to legal protection against misappropriation of such a formula, process, device or compilation of information is the element of secrecy." *Delta Filter Corp. v. Morin*, 108 A.D.2d 991, 485 N.Y.S.2d 143, 144 (3d Dep't 1985). Based on standards outlined in the Restatement, courts have recognized the existence of secrecy in two related areas: "(1) as substantial exclusivity of knowledge of the formula, process, device or compilation of information ('Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret'); and (2) as the employment of precautionary measures to preserve such exclusive knowledge by limiting legitimate access by others ('Nevertheless, a substantial element of secrecy must exist, so that, except by the use of improper

of New York regarding that claim. *See* Deft. Mem. of Law at 9 n. 1.

means, there would be difficulty in acquiring the information.')". *Id.* (citing RESTATEMENT OF TORTS § 757 cmt. b). The continuing competitive advantage created by a trade secret may be lost, however, "once it is implemented for the world to see and for competitors to legally imitate." *Hudson Hotels Corp.*, 995 F.2d at 1176 n. 2 (quoting *Richter*, 529 F.2d at 900)); *see also WMW Mach. Co., Inc. v. Koerber AG*, 240 A.D.2d 400, 658 N.Y.S.2d 385, 387 (2d Dep't 1997) (denying trade secret protection where plaintiff's customer information was "readily discoverable through public sources"); *Delta Filter Corp.*, 485 N.Y.S.2d at 144; *Eagle Comtronics, Inc. v. Pico, Inc.*, 89 A.D.2d 803, 453 N.Y.S.2d 470, 472 (4th Dep't) ("[D]espite [plaintiff's] proof that it had not disclosed information about the interference filter to [defendant], it is clear that the [trade secret at issue] could easily be copied by others without using improper means."), *appeal denied*, 58 N.Y.S.2d 601, 458 N.Y.S.2d 1025, 444 N.E.2d 1012 (1982). The plaintiff has the burden of proving that its product is "significantly distinctive or secret so as to merit trade secret protection." 104 N.Y. JUR 2D, TRADE REGULATION § 244 (1992).

■ Plaintiff acknowledges that it is "not uncommon practice in the snowplow industry to copy the designs of competitors' snowplows," Pl. 7.1 Stat. at ¶ 36, and that its snowplow design was capable of being "reverse engineered" by its competitors once its product was marketed and offered to the public for sale. *See* Pl. Mem. of Law at 16; *see also Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 160, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989) (citing *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 476, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974) ("[T]rade secret law, however, does not offer protection against

discovery by ... so-called reverse engineering, that is by starting with the known product and working backward to divine the process which aided in its development or manufacture.")). Indeed, any secrecy that existed in plaintiff's snowplow design could be easily acquired by a competitor and "was lost when it was placed upon the market." *Eagle Comtronics, Inc.*, 453 N.Y.S.2d at 472; *see also Hudson Hotels Corp.*, 995 F.2d at 1177 ("Once [plaintiff's product was marketed], it could not constitute a. protectible trade secret because, from that time forward, it could not be used secretly and continuously in its business."); *Delta Filter Corp.*, 485 N.Y.S.2d at 144–45. *Compare Integrated Cash Management Servs., Inc.*, 920 F.2d at 174 (noting that the architecture underlying plaintiff's computer software programs "could not be readily duplicated without the secret information" and, therefore, was not "readily ascertainable") (citing *Defiance Button Mach. Co. v. C & C Metal Prods. Corp.*, 759 F.2d 1053, 1063 (2d Cir.), *cert. denied*, 474 U.S. 844, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985)). Thus, the Court finds that the information contained in plaintiff's engineering and production drawings, and jigs and fixtures involve public matters and, therefore, do not constitute a protectible trade secret.

■ Additionally, plaintiff did not treat these items in a manner consistent with a trade secret. Specifically, plaintiff acknowledges that it readily shared "technology and exchanged engineering drawings" with Frink Canada and FEI prior to Champion's purchase of FEI's assets.[7] *See* Pl. Mem. of Law at 15. Moreover, plaintiff also failed to safeguard its process and equipment from public disclosure by "tak[ing] rudimentary precautions" to prevent its employees or competitors from

---

7. Although plaintiff argues that its snowplow designs and drawings constituted trade secrets, it did not assert its trade secret claim against Champion until September 25, 1996, approximately two years after Champion purchased the assets of FEI (which allegedly included plaintiff's protected trade secrets) and began manufacturing snow removal equipment in direct competition with plaintiff in the United States. Plaintiff's delay in recovering this information is inconsistent with its position that such information constituted a trade secret.

acquiring familiarity with the production designs and equipment for its snowplow equipment. *See Defiance Mach. Co.,* 759 F.2d at 1063 (holding that plaintiff's customer lists lost their character as trade secrets because the company failed, upon selling most of its tangible assets, to take adequate measures to ensure the secrecy of the lists); *Anacomp, Inc.,* 1994 WL 9681, at *9 ("[A]mong the factors to be considered in determining whether a secret has been protected, is the extent to which employers have taken appropriate precautions to alert employees of the need to maintain the confidentiality of the information."); *Delta Filter Corp.,* 485 N.Y.S.2d at 145; *McCann Constr. Specialties Co. v. Bosman,* 44 Ill.App.3d 1020, 3 Ill.Dec. 655, 358 N.E.2d 1340, 1342 (1977) (holding that a customer list was not a trade secret when it was "not under lock and key, and there [was] no evidence of any effort on the part of the plaintiff to insure that [the] list should be considered secret or confidential"). Although Lowry alleges that he informed Champion that it was "not legally permitted to use Frink America's intellectual property," Pl. 7.1 Stat. at 23, ¶ 7, Lowry does not allege that he similarly informed Ernst & Young, FEI's receiver; accordingly, plaintiff had little, if any assurance that its intellectual property would not be disclosed and used by a third party competitor in the event that FEI's intellectual property was sold to someone other than the defendant. Because plaintiff failed to sustain its burden of proof that the process or equipment used in producing its snowplow equipment was significantly distinctive or secret so as to merit trade secrecy protection, defendant's motion to dismiss plaintiff's misappropriation of trade secrets claim is granted.

### C. State Law Claims For Unfair Competition and Conversion

Although defendant moves in its Notice of Motion to dismiss all of plaintiff's claims, it fails to provide argument in its Memorandum of Law to support dismissal of plaintiff's state law claims for conversion and unfair competition. Contrary to defendant's assertion, defendant is not required to rebut "every conceivable additional cause of action that might have been parsed out of the numerous factual allegations contained in the Amended Complaint;" Def. Reply Mem. of Law at 1 n. 1, rather, it is required to support dismissal of claims clearly set forth in the Amended Complaint. *See* Amended Compl. at ¶ 36 (conversion claim) and ¶ 56 (unfair competition).

In the present case, defendant's legal arguments for dismissal of plaintiff's common law conversion and unfair competition claims are included in its reply papers, see Deft. Reply Mem. of Law at 4–9, thereby "precluding the plaintiff from offering a meaningful response" to defendant's arguments on these claims. *Mercer Tool Corp. v. Friedr. Dick GmbH,* 179 F.R.D. 391, 398 (E.D.N.Y.1998) (noting that it is "procedurally improper to raise [an] issue for the first time in reply papers"); *see also Tischmann v. ITT/Sheraton Corp.,* 145 F.3d 561, 568 n. 4 (2d Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 406, 142 L.Ed.2d 329 (1998); *In re Motel 6 Sec. Litig.,* 1997 WL 154011, at * 2 (S.D.N.Y. Apr.2, 1997); *Duamutef v. Morris,* 956 F.Supp. 1112, 1114 (S.D.N.Y.1997) ("I remind defendant that 'a reply brief is just that—a reply—and is not an occasion to raise issues for the first time . . . .' New issues raised in a reply may be treated as a nullity.") (quoting *Kadic v. Karadzic,* 1993 WL 385757, at *1 (S.D.N.Y. Sept.24, 1993)). Accordingly, defendant's motion to dismiss plaintiff's state-based conversion and unfair competition claims is denied.

### D. Federal Unfair Competition and State Tortious Interference With Business Relations Claims

Defendant also seeks dismissal of plaintiff's federal-based unfair competition claim, see 15 U.S.C. § 1125(a), and state-based tortious interference with business relations claim.

Plaintiff does not address these claims in its opposition papers, leading the Court to conclude that it has abandoned them.[8] *See Riley v. Town of Bethlehem*, 44 F.Supp.2d 451, 466–67 (N.D.N.Y. 1999); *Lauro v. The City of New York*, 39 F.Supp.2d 351, 366, n. 13 (S.D.N.Y. 1999) ("Apparently conceding this point, plaintiff does not even argue in either his memoranda of law that his ... claim should survive summary judgment."); *Douglas v. Victor Capital Group*, 21 F.Supp.2d 379, 393 (S.D.N.Y.1998) (deeming claims abandoned and recommending dismissal when plaintiff failed to provide opposition argument) (citing *Singleton v. City of Newburgh*, 1 F.Supp.2d 306, 312 (S.D.N.Y. 1998) (plaintiff's claim deemed "abandoned" and defendants' summary judgment granted where claim was alleged in the complaint but "not raised elsewhere in the record"); *National Communications Ass'n, Inc. v. American Tel. & Tel. Co.*, 1998 WL 118174, at *28 (S.D.N.Y. March 16, 1998) (plaintiff's claim deemed "abandoned" and defendant granted summary judgment where plaintiff did not address claim in response to defendant's summary judgment motion); *Anti–Monopoly, Inc., v. Hasbro, Inc.*, 958 F.Supp. 895, 907 & n. 11 (S.D.N.Y.) ("[T]he failure to provide argument on a point at issue constitutes abandonment of the issue."), *aff'd*, 130 F.3d 1101 (2d Cir.1997), *cert. denied*, —— U.S. ——, 119 S.Ct. 48, 142 L.Ed.2d 37 (1998); *Ortho Pharm. Corp. v. Cosprophar, Inc.*, 828 F.Supp. 1114, 1129 (S.D.N.Y. 1993) (claim dismissed where plaintiff "appears to have abandoned this claim, having failed to argue the claim in its post-trial memo or in its response papers once [defendant] had addressed the issues in its own brief"), *aff'd*, 32 F.3d 690 (2d Cir. 1994)); *see also Irwin v. City of New York*, 902 F.Supp. 442, 451 (S.D.N.Y.1995) (dismissing equal protection claim on summary judgment when plaintiff presented no argument in opposition). Accordingly, these claims are dismissed.

## E. Trademark Infringement Claims

To prevail on a claim of trademark infringement, plaintiff must show that defendant "(1) without permission, copied, reproduced, or imitated the plaintiff's (2) registered trademark in commerce (3) as part of the sale or distribution of goods or services (4) and that such use is likely to cause confusion between the two marks." *Streetwise Maps, Inc. v. Vandam, Inc.*, 159 F.3d 739, 742 (2d Cir.1998) (citing 15 U.S.C. § 1114(1)(a)); *see also Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1075 (2d Cir.1993). Because the parties do not seriously dispute the first three factors, the central issue before the Court is whether defendant's alleged use of the FRINK trademark is likely to cause confusion.[9] *See Streetwise Maps, Inc.*, 159 F.3d at 743 (citing *Arrow Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384, 390–91 (2d Cir.1995)).

"To support a finding of infringement, a *probability* of confusion, not a mere possibility, must exist." *Id.* (emphasis added) (citing *Estee Lauder Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1510 (2d Cir.1997) (quoting 3 J. MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:2, at 23–10 to –11 (1996))); *see also Gruner + Jahr USA Publ'g*, 991 F.2d at 1077 ("[I]n order to succeed in a trade-

---

8. While plaintiff expends considerable effort in arguing that defendant has not addressed plaintiff's state-based unfair competition claim in its Memorandum of Law, plaintiff fails to do the very same thing in opposition to defendant's motion to dismiss plaintiff's federal-based unfair competition claim. *See* Pl. Mem. of Law at 7–9.

9. Because the parties do not distinguish between the federal and state infringement claims in their Memoranda of Law, and both claims employ a "likelihood of confusion" test, the Court's analysis is applicable to both infringement claims. 104 N.Y. JUR 2D § 185 ("The test of infringement of a technical trademark is the likelihood of confusion....").

mark infringement suit, [plaintiff must show] that there is a likelihood of confusion or, in other words, that numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product in question . . . ."). A probability of confusion "may be found when a large number of purchasers likely will be confused as to the source of the goods in question." *Streetwise Maps, Inc.,* 159 F.3d at 743.

■ In determining whether plaintiff has established a likelihood of confusion, the Court will weigh the eight factors outlined by the Second Circuit in *Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492, 495 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). *See Streetwise Maps, Inc.,* 159 F.3d at 743; *Arrow Fastener Co., Inc.,* 59 F.3d at 391; *Gruner + Jahr USA Publ'g,* 991 F.2d at 1077. Commonly referred to as the "Polaroid factors," these factors include: "(1) the strength of the plaintiff's mark; (2) the similarity of plaintiff's and defendant's marks; (3) the competitive proximity of their products; (4) the likelihood that plaintiff will 'bridge the gap' and offer a product like defendant's; (5) actual confusion between products; (6) defendant's good faith; (7) the quality of defendant's product as compared to plaintiff's; and (8) the sophistication of the purchasers." *Streetwise Maps, Inc.,* 159 F.3d at 743 (citing *Polaroid Corp.,* 287 F.2d at 495). Because "[n]o one of the Polaroid factors is dispositive, and the list is not exhaustive[,] 'the analysis of the factors is not a mechanical process,'" *Estee Lauder Inc.,* 108 F.3d at 1510 (quoting *Arrow Fastener Co., Inc.,* 59 F.3d at 391), and "other factors may be added or initial factors abandoned." *Streetwise Maps, Inc.,* 159 F.3d at 743 (citing *Gruner + Jahr USA Publ'g,* 991 F.2d at 1077).

## 1. Strength of the Mark

■ The "strength of the mark" refers to "a mark's 'tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source.'" *Arrow Fastener Co., Inc.,* 59 F.3d at 391 (quoting *McGregor–Doniger, Inc. v. Drizzle, Inc.,* 599 F.2d 1126, 1131 (2d Cir.1979)). "To gauge a mark's strength, courts consider two factors: [the mark's] inherent distinctiveness, and its distinctiveness in the marketplace." *Streetwise Maps, Inc.,* 159 F.3d at 743–44 (citing *W.W.W. Pharm. Co. v. Gillette Co.,* 984 F.2d 567, 572 (2d Cir.1993)). Here, the parties do not dispute that the FRINK mark is a valid trademark; rather, the question is the degree of protection afforded to that mark. *See, e.g., Arrow Fastener Co., Inc.,* 59 F.3d at 391.

The protection enjoyed by a mark depends on whether the mark is classified as generic, descriptive, suggestive, arbitrary or fanciful. *See Streetwise Maps, Inc.,* 159 F.3d at 744 (noting that the categories are listed in "increasing order of inherent distinctiveness"); *Arrow Fastener Co., Inc.,* 59 F.3d at 391. A generic term is "a common name, like automobile or aspirin, that describes a kind of product," *Gruner + Jahr USA Publ'g,* 991 F.2d at 1075; a descriptive term "is one that tells something about a product, its qualities, ingredients or characteristics . . . . [and] may point to a product's intended purpose, its function or intended use, its size, or its merit," *id.* at 1076; a suggestive term "suggest[s] the features of the product and require[s] the purchaser to use his or her imagination to figure out the nature of the product," *Streetwise Maps, Inc.,* 159 F.3d at 744 (classifying the term "streetwise" as a suggestive term); an arbitrary term "is never a common name for a product, bears little or no relationship to the kind or product represented . . . . [and] has a dictionary meaning—though not describing the product—like IVORY for soap," *Gruner + Jahr USA Publ'g,* 991 F.2d at 1075–76; and a fanciful mark is "a name that is made-up to identify the trademark owner's product like EXXON for oil products and KODAK for photography products." *Id.* (citing J. THOMAS MCCARTHY, TRADEMARKS

AND UNFAIR COMPETITION, §§ 11:2, 11:3, 11:4A (2d ed.1984)). Based on these guidelines, the Court finds that the FRINK mark is properly classified as a fanciful mark.

The next step is to determine the product's "distinctiveness in the marketplace." *Streetwise Maps, Inc.,* 159 F.3d at 743. Here, defendant has not demonstrated that the strength of plaintiff's mark has been diminished by third-party use, and plaintiff has not demonstrated that its mark is "exceptionally strong." *See Nabisco, Inc. v. PF Brands, Inc.,* 1999 WL 47313, at *12 (S.D.N.Y. Feb.3, 1999) (finding the Pepperidge Farm Goldfish to constitute a strong mark); *see also Mondo, Inc. v. Sirco Int'l Corp.,* 1998 WL 849401, at * 6 (S.D.N.Y. Dec.7, 1998). Accordingly, the Court finds that the FRINK mark is entitled to some trademark protection. Therefore, this factor slightly favors plaintiff. *See Streetwise Maps, Inc.,* 159 F.3d at 744.

## 2. Similarity of the Marks

■■■■ "In determining whether the two marks are similar, and therefore likely to provoke confusion among prospective purchasers, courts appraise 'the overall impression created by the logos and the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers.'" *Streetwise Maps, Inc.,* 159 F.3d at 744 (quoting *Gruner + Jahr USA Publ'g,* 991 F.2d at 1078). Because plaintiff alleged that defendant used the *actual* FRINK mark in the United States, this factor favors plaintiff. *See id.*

## 3. Competitiveness

"This factor considers whether the two products compete in the same market." *Id.* at 745. Because defendant's efforts were aimed at directly competing with plaintiff with respect to a targeted class of consumers in the United States—governmental agencies such as airports and highway departments that use large snowplows—this factor favors plaintiff. *See Gruner + Jahr USA Publ'g,* 991 F.2d at 1078.

## 4. Bridging the Gap

Because the parties already occupy the same market of large snowplows for use by governmental agencies, the gap has been bridged and this factor is therefore "not relevant as an individual factor." *See Streetwise Maps, Inc.,* 159 F.3d at 743.

## 5. Actual Confusion

■■■■ "[E]vidence of actual consumer confusion is particularly relevant to a trademark infringement action." *Id.* at 745 (citing *Sports Auth., Inc. v. Prime Hospitality Corp.,* 89 F.3d 955, 963–64 (2d Cir.1996)). In the present case, plaintiff failed to provide any relevant evidence—in the form of affidavits or other documentary evidence—of actual confusion between the two products. Rather, plaintiff relies primarily on a "presumption of confusion" based on defendant's inadvertent distribution of sales literature and invoices bearing the Frink America name in the United States.[10] Pl. 7.1 Stat. at ¶ 43. At most, plaintiff has shown the possibility, rather than the probability, of confusion. *See Gruner + Jahr USA Publ'g,* 991 F.2d at 1079. Accordingly, "the absence of proof of actual confusion, although not dispositive of the question of likelihood of confusion," is a factor strongly favoring defendant. *Streetwise Maps, Inc.,* 159 F.3d at 745 (citing *Arrow Fastener Co., Inc.,* 59 F.3d at 397).

## 6. Good Faith

■■■■ "This factor considers 'whether the defendant adopted its mark with the intention of capitalizing on plaintiff's repu-

10. Defendant contends, and plaintiff does not dispute, that the sales invoices were sent to defendant's U.S. dealers, and was not seen by any of its customers. *See* Deft. Reply Mem. of Law at 10 n. 13.

tation and goodwill and any confusion between his and the senior user's product.'" *Arrow Fastener Co., Inc.*, 59 F.3d at 397 (quoting *Lang v. Retirement Living Publ'g Co., Inc.*, 949 F.2d 576, 583 (2d Cir.1991)). Although "'[i]ssues of good faith are generally ill-suited for disposition on summary judgment,'" *Lang*, 949 F.2d at 583 (quoting *Leberman v. John Blair & Co.*, 880 F.2d 1555, 1559–60 (2d Cir.1989)), the Court finds that defendant acted in good faith. *See, e.g., id.*

Defendant contends, and plaintiff does not dispute, that its use of the FRINK trademark in the United States was based on its inadvertent distribution of sales invoices and advertising materials bearing the FRINK mark by defendant's sales staff. *See* Deft. Mem. of Law at 18. After learning that this had occurred, defendant immediately recalled these materials. *See id.* Accordingly, the Court finds that the evidence, taken as a whole, does not reasonably give rise to an inference of bad faith. Accordingly, this factor favors defendant.

### 7. Quality of Defendant's Product

Because the parties do not argue that the quality of their products are not similar, this factor is neutral, and thus, favors neither party. *See Streetwise Maps, Inc.*, 159 F.3d at 743 (citing *Gruner + Jahr USA Publ'g*, 991 F.2d at 1079 (Quality is weighed against the defendant only "when there is an allegation that a low quality product is taking unfair advantage of the public good will earned by a well-established high quality product.")).

### 8. Sophistication of the Parties

The final *Polaroid* factor "recognizes that the likelihood of confusion between the products at issue depends in part on the sophistication of the relevant purchasers." *Arrow Fastener Co., Inc.*, 59 F.3d at 398 (citing *W.W.W. Pharm. Co., Inc.*, 984 F.2d at 575). Thus, courts consider "'[t]he general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods.'" *The Sports Auth., Inc.*, 89 F.3d at 965 (quoting *W.W.W. Pharm. Co., Inc.*, 984 F.2d at 575) (quotation omitted). "'[T]he more sophisticated and careful the average consumer of a product is, the less likely that similarities in ... trademarks will result in confusion concerning the source of sponsorship of the product.'" *Nikon Inc. v. Ikon Corp.*, 987 F.2d 91, 95 (2d Cir.1993) (citation omitted).

Here, the snowplows are sold through a detailed competitive bidding process where the potential consumers—governmental agencies such as airports and highway departments—possess a high level of knowledge and are spending substantial amounts of money on specialized snow removal equipment. *See Arrow Fastener Co., Inc.*, 59 F.3d at 398–99. *Compare The Sports Auth., Inc.*, 89 F.3d at 965 (finding that consumers are not likely to be sophisticated where goods and services sold by the parties involve inexpensive food and sporting goods). Furthermore, the products at issue here are targeted for a specialized class of consumers who possess a high level of sophistication and who are not likely to be confused by the different snowplows marketed by the parties. *See Arrow Fastener Co., Inc.*, 59 F.3d at 399. Accordingly, this factor favors defendant.

After carefully assessing the combined weight of the *Polaroid* factors, the Court finds that there is not a probable likelihood consumers will be confused by defendant's alleged use of the FRINK trademark. Of the eight factors examined above, three factors favored plaintiff (factors 1, 2, and 3), three factors favored defendant (5, 6, and 8), one factor was irrelevant (factor 4), and one factor was neutral (factor 7). While "[n]o single factor is dispositive," *Arrow Fastener Co., Inc.*, 59 F.3d at 400, the Court finds that plaintiff's primary evidence of infringement—sales invoices and advertising material bearing the FRINK mark—is insuffi-

cient to give rise to a genuine issue of fact that there was a likelihood that consumers were confused by defendant's use of the FRINK mark. This conclusion is supported in light of the process the parties engage in when marketing their goods for sale to the public. Specifically, the parties acknowledge that sales of snow removal equipment in the United States are achieved through a competitive bidding process whereby the lowest bidder is awarded the contract. *See* Pl. 7.1 Stat. at ¶ 33; Deft. Mem. of Law at 18 n. 7. Because the sales invoices and advertising materials cited by plaintiff are not likely to be seen by consumers who participate in the bidding process, it logically follows that these materials are not likely to "cause an appreciable number of ordinarily prudent purchasers to be confused, as is required for a successful trademark infringement claim." *Gruner + Jahr USA Publ'g,* 991 F.2d at 1080. Accordingly, defendant's motion to dismiss plaintiff's trademark infringement claims is granted.

## F. Trademark Dilution Claims

In its Complaint, plaintiff asserts federal and state trademark dilution claims. In its moving papers, defendant argues that because the remedy for a dilution claim is generally injunctive relief,[11] see 15 U.S.C. § 1125(c)(2); N.Y. Gen. Bus. Law § 368,[12] plaintiff's claims are moot because defendant has "ceased using the FRINK mark *anywhere in the world,* . . . has since quit the snowplow business entirely and plainly has no intention or desire to use the FRINK mark at any time in the future." Deft. Mem. of Law at 18–19 (emphasis in

original). Plaintiff, however, does not address these claims or defendant's arguments in its opposition papers, leading the Court to conclude that plaintiff has abandoned its trademark dilution claims. *See Riley,* at 466; *Lauro,* 39 F.Supp.2d at 366 n.13; *Douglas,* 21 F.Supp.2d at 393.

The Court also notes that plaintiff's claim for injunctive relief on its trademark dilution claims is moot in light of defendant's actions.

■ " 'A suit for injunctive relief is moot when the offending conduct ceases and the court finds that there is no reasonable expectation that it will resume.' " *Greilsheimer v. Ferber Chan & Essner,* 1998 WL 547092, at *2 (S.D.N.Y. Aug.27, 1998) (quoting *American Express Travel Related Servs. Co., Inc. v. MasterCard Int'l Inc.,* 776 F.Supp. 787, 789 (S.D.N.Y.1991)(internal citation omitted)); *Upjohn Co. v. American Home Prods. Corp.,* 598 F.Supp. 550, 554 (S.D.N.Y. 1984).

Here, defendant asserts that it has ceased using plaintiff's mark and exited the snow removal equipment business. Plaintiff does not dispute, nor has it presented evidence to contradict defendant's assertion. Because there is no indication that defendant's "offending conduct" will resume in the future, plaintiff's request for injunctive relief is dismissed as moot. *See Greilsheimer,* 1998 WL 547092, at *2–*3; *see also Coors Brewing Co. v. Anheuser–Busch Cos., Inc.,* 802 F.Supp. 965, 970 (S.D.N.Y.1992). *Compare Upjohn Co.,* 598 F.Supp. at 555 (injunctive relief claim not dismissed as moot where offending materi-

---

**11.** In its Complaint, plaintiff moved solely for injunctive relief with respect to its federal and state trademark dilution claims. *See* Compl. 96–CV–486 at ¶¶ 25–30 (filed August 1, 1996). Moreover, because plaintiff does not argue, nor does the record reflect that defendant "willfully intended to trade on [plaintiff's] reputation or to cause dilution" of its mark, plaintiff's remedy is limited to injunctive relief. 15 U.S.C. § 1125(c)(2); *see also Monsanto Co. v. Haskel Trading, Inc.,* 13 F.Supp.2d 349, 361 n. 7 (E.D.N.Y.1998) (noting that section 368–d of New York's General

Business Law only made available injunctive relief).

**12.** New York's anti-dilution statute, N.Y. Gen. Bus. Law § 368 was repealed effective January 1, 1997. *See Cortland Line Co., Inc. v. The Orvis Co., Inc.,* 1998 WL 743722, at *1 n. 2 (N.D.N.Y. Oct.7, 1998) (Munson, S.J.). Because plaintiff's Complaint was filed prior to the repeal date, it is not prohibited from raising its state-based trademark dilution claim.

als were distributed contrary to defendant's assurances and defendant "made no attempt to retrieve these materials or to instruct the trade to disregard them").

### G. Supplemental Jurisdiction

In the present case, the parties' federal and state law claims and counterclaims all arise out of the same transaction and occurrence. Remaining, however, are plaintiff's state law claims and defendant's federal and state law counterclaims. Thus, defendant's federal counterclaims provide an independent basis of federal jurisdiction in this action. Accordingly, the Court will retain supplemental jurisdiction over the remaining state law claims and counterclaims. *See* 28 U.S.C. § 1367(a) (West 1999); 6 CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 1414 (West 1990).

### III. CONCLUSION:

For all of the foregoing reasons, defendant's motion for summary judgment is granted in part, and denied in part. Defendant's motion for summary judgment is GRANTED with respect to plaintiff's federal and state law trademark infringement, federal and state trademark dilution, copyright infringement, trade dress infringement, breach of contract, misappropriation of trade secrets, tortious interference with business relations and federal unfair competition claims, and DENIED with respect to plaintiff's state unfair competition and conversion claims.

**IT IS SO ORDERED.**