OPINION OF THE COURT
 

 Simons, J.
 

 This litigation involves a dispute between an investment management firm and a former employee. The employee developed a mathematical model for determining investment strategy and sought unsuccessfully to sell it to the firm. A dispute arose during the negotiations and plaintiff, Ashland Management Inc., instituted this action seeking to foreclose defendant from using his model. It alleged that the model is based upon trade secrets defendant misappropriated from the firm. Defendant claims he and plaintiff had agreed upon a contract for the use of the model and that plaintiff breached the contract. Defendant, therefore, counterclaimed seeking damages.
 

 After a nonjury trial, Supreme Court found that the parties had entered into a contract and that plaintiff had breached it. Accordingly, the court awarded defendant damages of $625,-000 for lost profits. It held further that the information available to defendant did not constitute a trade secret of Ashland and therefore defendant was not guilty of misappropriation. The Appellate Division, after a minor modification, affirmed the judgment.
 

 The principal legal questions presented concern the availability of damages for lost profits under the rule stated in our two decisions in
 
 Kenford Co. v County of Erie
 
 (67 NY2d 257
 
 [Kenford I]; and
 
 73 NY2d 312
 
 [Kenford II])
 
 and whether the court applied the correct legal standard for trade secrets in determining the misappropriation claim.
 

 I.
 

 Ashland Management Inc. is a successful investment advisory company which manages over $1 billion in client funds. As part of its investment strategy, Ashland relies on a compu
 
 *400
 
 terized mathematical stock selection model, known as Alpha, to analyze selected financial information and make an initial determination of which stocks should be bought and sold. Alpha is based on six selected financial criteria which are then evaluated according to various mathematical calculations. In its promotional materials Ashland discloses these criteria, but does not disclose the underlying mathematical calculations used to evaluate them. A decision to purchase or sell a stock selected by Alpha is made only after a detailed analysis by Ashland’s money managers.
 

 Charles Hickox is Ashland’s chairman. Defendant Janien is Hickox’s brother-in-law and was briefly employed by Ashland in 1981 after his graduation from college. Janien left plaintiff to attend the University of Pennsylvania’s Wharton School of Business. He returned to Ashland as a consultant after completing his studies there. While at Wharton, Janien wrote a thesis which investigated the ability of various financial criteria, including the six criteria used by Alpha, to identify undervalued stocks. Based on his research he concluded that one particular model, which Janien named Eta, performed exceptionally well.
 

 In 1985 Hickox and Janien entered into discussions about the development of a second investment model to be used by Ashland. Eta appeared to fit Ashland’s needs for a long-term growth model to supplement Alpha’s short-term characteristics and the parties entered into extensive negotiations to fix their rights and liabilities in its development and ultimate use. Five draft agreements were exchanged before they settled on a sixth writing, denominated Proposal 6. Proposal 6 provided that Janien was to construct a new stock selection model, that upon completion the model would be reviewed by an independent third party, and, if found satisfactory, ownership of the model would then be transferred to an Ashland subsidiary which would employ Janien and in which he was to have an equity interest.
 

 Paragraph C (12) of the Proposal projected the minimum sums expected to be under management by the Eta model for each year between 1988 and 1992. It also provided that if these minimum objectives were not achieved, Ashland could terminate Janien’s employment. Finally, paragraph C (21) provided that if "for any reason” Janien left Ashland’s employment he was entitled to "a royalty of the higher of $50,000 or 15% of gross revenues per annum of any and all
 
 *401
 
 existing or future accounts” using the Eta model or "any derivative thereof’. The gross revenue was the 1% fee charged customers by Ashland for the funds under management. In June of 1989, after the parties had settled on Proposal 6, Janien approached Hickox with the draft of a nondisclosure agreement. Hickox refused to sign or discuss the agreement, however, and terminated Janien’s employment with Ashland.
 

 After dismissing Janien, Ashland sought a permanent injunction which would bar Janien from using Eta. It asserted that Alpha was a trade secret of Ashland that formed an integral part of Eta. Ashland claimed, therefore, that any attempt by Janien to use Eta commercially would result in misappropriation of its trade secrets. Janien denied that Alpha was a trade secret or that he had misappropriated it and counterclaimed for damages, asserting that Ashland had breached the contract between the parties and that he was entitled to recover lost profits.
 

 Supreme Court held that: (1) the parties orally agreed to be bound by the terms of Proposal 6; (2) Proposal 6 was a joint venture agreement; (3) defendant’s proposed nondisclosure agreement was consistent with the terms of Proposal 6; (4) Hickox’s refusal to negotiate the terms of the nondisclosure agreement and his termination of Janien constituted a breach of fiduciary duty under the joint venture agreement; (5) Janien was entitled to damages for lost profits based on the projections set forth in paragraph C (12) of Proposal 6; and (6) Alpha was not a trade secret and, therefore, Janien had not misappropriated Ashland’s trade secrets.
 

 The Appellate Division modified the judgment, concluding that since Proposal 6 did not contain an agreement to share losses, it could not be classified as a joint venture. The Court held that defendant was entitled to recover, nonetheless, because the parties had intended to be bound by Proposal 6 and Ashland had breached the agreement’s implied duty of good faith and fair dealing by using the nondisclosure issue as an excuse for failing to implement the contract.
 

 II.
 

 Plaintiff first disputes that the parties had a contract or that Ashland breached it. It is a settled principle of contract construction, however, that when "the intent [of parties to be bound by an agreement] must be determined by disputed evidence or inferences outside the written words of the instru
 
 *402
 
 ment * * * a question of fact [is] presented”
 
 (Mallad v County Fed. Sav. & Loan Assn.,
 
 32 NY2d 285, 291 [citing
 
 O’Neil Supply Co. v Petroleum Heat & Power Co.,
 
 280 NY 50, 56]). Proposal 6 was the product of six months of detailed negotiations between the parties. The testimony surrounding these efforts, and of the parties’ eventual satisfaction with its terms, provides support for the finding of the trial court, affirmed by the Appellate Division, that the parties intended to be bound by it. Accordingly, our power to review the question is at an end.
 

 Plaintiff contends, however, that even if it is assumed there was an agreement, the Appellate Division erred in determining that it breached an implied covenant of good faith and fair dealing by its refusal to negotiate a nondisclosure agreement
 
 (see, Kirke La Shelle Co. v Armstrong Co.,
 
 263 NY 79, 87;
 
 see also, Ely-Cruikshank Co. v Bank of Montreal,
 
 81 NY2d 399, 403;
 
 see generally,
 
 Restatement [Second] of Contracts § 205; 2 Farnsworth, Contracts § 7.17 [a] [2d ed 1990]). Plaintiff’s position is that an implied covenant of good faith and fair dealing cannot create duties which are inconsistent with other terms of the contractual relationship and that here the nondisclosure agreement was inconsistent with the terms of Proposal 6
 
 (see, Murphy v American Home Prods. Corp., 58
 
 NY2d 293, 304).
 

 The contract provisions dealing with the transfer of ownership of Eta make clear that the parties considered confidentiality and determined that Janien was to retain some of the benefits of his work. Paragraph C (27) provided that no proprietary information associated with Eta would be disclosed without the consent of both the board of directors of Ashland and Janien and stated that all research performed before and after acceptance of the model, except as to proprietary information inherent in the model, remained the property of Janien. Under the terms of Proposal 6, Janien was required to present Ashland with detailed information concerning Eta, information which until then had been seen only by Janien and a professor at Wharton. Before doing so, Janien understandably wanted some agreement on the rights to his research. Thus, he requested Hickox to prepare a letter detailing those rights and implementing the confidentiality provisions of Proposal 6. Hickox agreed to prepare such a letter but neglected to do so. Accordingly, Janien brought the draft nondisclosure agreement with him to the meeting at which his research was to be disclosed to Hickox. Janien had based
 
 *403
 
 the agreement on a form book example, and told Hickox that it was intended only as a preliminary proposal. Nonetheless, Hickox rejected the draft out of hand and fired Janien.
 

 Supreme Court found that Hickox used the draft as a pretext to breach the agreement and based upon this finding the Appellate Division was warranted in concluding that Ashland failed in its implied duty of acting to implement Proposal 6 in good faith.
 

 III.
 

 Plaintiffs primary contention is that defendant is not entitled to recover lost profits even if it is responsible for breaching the contract.
 

 A party may not recover damages for lost profits unless they were within the contemplation of the parties at the time the contract was entered into and are capable of measurement with reasonable certainty. The rule that damages must be within the contemplation of the parties is a rule of foreseeability. The party breaching the contract is liable for those risks foreseen or which should have been foreseen at the time the contract was made. The breaching party need not have foreseen the breach itself, however, or the particular way the loss came about. It is only necessary that loss from a breach is foreseeable and probable
 
 (see,
 
 Restatement [Second] of Contracts § 351; 3 Farnsworth, Contracts § 12.14 [2d ed 1990]).
 

 The second requirement, that damages be reasonably certain, does not require absolute certainty. Damages resulting from the loss of future profits are often an approximation. The law does not require that they be determined with mathematical precision. It requires only that damages be capable of measurement based upon known reliable factors without undue speculation
 
 (see,
 
 Restatement [Second] of Contracts § 352; 3 Farnsworth, Contracts § 12.15 [2d ed 1990];
 
 see, Kenford I, supra,
 
 and
 
 Kenford II, supra; and see generally,
 
 Restatement [Second] of Contracts §§ 351, 352; 3 Farnsworth, Contracts §§ 12.14, 12.15 [2d ed 1990]).
 

 Our decisions in the
 
 Kenford
 
 appeals illustrate these rules. In 1969, Erie County entered into a contract with the Kenford Co. for the construction of a domed stadium to be built near the City of Buffalo. The contract provided, among other things, that construction of the stadium was to commence within 12 months of the contract date and that the parties would execute an attached 20-year contract authorizing Ken-
 
 *404
 
 ford to manage its operation. A breach occurred when construction of the stadium was not timely commenced and Kenford instituted an action for damages sustained as a result of the breach, principally anticipated profits from the management contract. In
 
 Kenford II
 
 plaintiff sought damages for lost appreciation in the value of real estate located in the periphery of the stadium site.
 

 In
 
 Kenford I
 
 we held that to recover damages for lost profits, it must be shown that: (1) the damages were caused by the breach; (2) the alleged loss must be capable of proof with reasonable certainty, and (3) the particular damages were within the contemplation of the parties to the contract at the time it was made. We also noted that in the case of a new business seeking to recover loss of future profits, a stricter standard is imposed because there is no experience from which lost profits may be estimated with reasonable certainty and other methods of evaluation may be too speculative (67 NY2d, at 261;
 
 see also, Cramer v Grand Rapids Show Case Co.,
 
 223 NY 63, 67-68). Whether the claim involves an established business or a new business, however, the test remains the same, i.e., whether future profits can be calculated with reasonable certainty.
 

 In discussing the first requirement, we held that the evidence was insufficient because it did not establish that the parties contemplated at the time of contracting that the County would be liable for lost profits over the 20-year term of the management agreement in the event of breach. The contract was silent on the subject and, therefore, we followed a "commonsense” rule to determine what the parties intended by considering what they would have concluded had they considered the subject at the time of entering into the contract. The evidence surrounding the negotiation and execution of the contract, we said, failed to demonstrate that the parties expected Erie County to bear the heavy responsibility for estimated future profits that plaintiff sought to impose on it. Similarly, in
 
 Kenford II,
 
 where plaintiff sought damages for loss of anticipated appreciation in the value of land surrounding the proposed stadium site, we held that the evidence did not support the conclusion that the parties contemplated liability, particularly when Kenford was under no contractual obligation with the County to purchase the land
 
 (Kenford II, supra).
 

 Applying these standards to the present action, it is
 
 *405
 
 manifest from an examination of Proposal 6 that the parties contemplated that Janien could recover damages if the agreement was not completed and that those damages could include lost profits from accounts using Eta. Paragraph C (21) provided that defendant was to receive 15% of the gross revenues per annum if he left Ashland "for any reason” and paragraph C (12) predicted the minimum funds anticipated to be under management from marketing Eta. The amounts set forth were minimum reasonable levels of investment the parties determined Eta would earn after studying and discussing the prospects extensively. Thus, the issue of future earnings was not only contemplated but also fully debated and analyzed by sophisticated business professionals at the time of these extended contract negotiations, projections of the increments to be anticipated over the years were calculated and provisions made for Janien’s share of the anticipated profits. Inasmuch as Janien was entitled to damages based upon the revenues derived from "any and all existing or future” accounts, plaintiff must have foreseen that if it breached the contract defendant would be entitled to lost profits.
 

 Plaintiff relies on
 
 Goodstein Constr. Corp. v City of New York
 
 (80 NY2d 366) for its claim that damages for lost profits were not contemplated here.
 
 Goodstein
 
 involved a claim for an estimated $800 million in future profits based on the breach of an agreement
 
 to negotiate
 
 a contract. We concluded that the claim for future lost profits under those circumstances was "even more 'irrational’ and 'illogical’ ” than the claim advanced in
 
 Kenford I (id.,
 
 at 375). By contrast, the parties before the court on this appeal had concluded a contract, as the courts below found, explicitly projected the dollar amounts they anticipated to be invested in the enterprise and provided that Janien was entitled to 15% of revenues earned from those investments if he was terminated for any reason.
 

 Lost profits must also be established with reasonable certainty. In
 
 Kenford I
 
 we observed that plaintiff’s evidence on the profits to be earned in managing the stadium was "massive and, unquestionably, represented] business and industry’s most advanced and sophisticated method for predicting the probable results of contemplated projects * * * [i]ndeed, it [was] difficult to conclude what additional proof could have been submitted”
 
 (Kenford I,
 
 at 261-262). Nevertheless, we determined that the evidence failed to meet the requirement of reasonable certainty because it rested on a host of speculative assumptions and few known factors
 
 (Kenford I,
 
 at 262).
 
 *406
 
 Before accepting plaintiffs figures, the court was obliged to assume not only that the stadium had been completed, opened and operated successfully for 20 years, but that it also attracted professional sporting events, concerts and conventions fully supported by the public.
 

 The projection of future profits in this case requires no such speculation.
 

 First, defendant’s claim rests on the parties’ carefully studied professional judgments of what they believed were realistic estimates of future assets to be managed by the use of Eta. By applying Ashland’s 1% management fee to these sums to determine the revenues derived from them and then allotting defendant 15% of those revenues, as paragraph C (21) provided, Janien’s loss could be easily computed. Second, while the parties were launching a new investment strategy, they were not entering a new or unfamiliar business
 
 (cf., Cramer, supra).
 
 Ashland had been a substantial presence in the financial management field for several years. The introduction of Eta was viewed as an addition to and an enhancement of Ashland’s existing Alpha strategy, which had been highly successful, and Ashland intended to rely on its experience in marketing Alpha to market Eta. Third, Ashland had a ready reservoir of customers for Eta because it intended to appeal not only to the market in general but also to its existing Alpha customers. Finally, although Eta had never been used in a commercial setting, it had been extensively back-tested over a number of years, and Ashland itself had enough confidence in its ability to perform to predict minimum amounts of funding which Eta would attract. It agreed to compensate Janien on that basis. Based on this evidence, the court properly relied on the projections of paragraph C (12) and the provisions of paragraph C (21) to hold that defendant had met his burden of proving his lost profits with reasonable certainty.
 

 IV.
 

 Plaintiff also contends that the court erred in denying it injunctive relief prohibiting Janien from exploiting Eta. It maintains Alpha is a trade secret of Ashland, that Alpha forms an integral part of Eta and, therefore, that any attempt by defendant to use Eta would constitute misappropriation of its trade secrets. Supreme Court concluded Alpha was not a trade secret.
 

 
 *407
 
 There is no generally accepted definition of a trade secret but that found in section 757 of Restatement of Torts, comment
 
 b
 
 has been cited with approval by this and other courts
 
 (Matter of New York Tel. Co. v Public Serv. Commn.,
 
 56 NY2d 213, 219, n 3;
 
 see also, Delta Filter Corp. v Morin,
 
 108 AD2d 991, 992;
 
 Eagle Comtronics v Pico, Inc.,
 
 89 AD2d 803, 804,
 
 lv denied
 
 58 NY2d 601). It defines a trade secret as "any formula, pattern, device or compilation of information which is used in one’s business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.”
 
 (Id.)
 
 The Restatement suggests that in deciding a trade secret claim several factors should be considered:
 

 "(1) the extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken by [the business] to guard the secrecy of the information; (4) the value of the information to [the business] and [its] competitors; (5) the amount of effort or money expended by [the business] in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others” (Restatement of Torts § 757, comment
 
 b).
 

 As these considerations demonstrate, a trade secret must first of all be secret: whether it is is generally a question of fact
 
 (see, Kaumagraph Co. v Stampagraph Co.,
 
 235 NY 1, 8-9;
 
 Union Kol-Flo Corp. v Basil,
 
 64 AD2d 861, 862;
 
 Chevron U.S.A. v Roxen Servs.,
 
 813 F2d 26, 29 [2d Cir]; 1 Milgrim, Trade Secrets § 2.03, at 2-32, 2-48 — 2-49 [1993]).
 

 Ashland maintains that in finding Alpha was not a trade secret the court relied on the fact that its six financial criteria were public knowledge. It contends the trade secret at issue is not the published criteria used in the calculations, but rather the series of mathematical formulae used to evaluate the criteria
 
 (cf., Integrated Cash Mgt. Servs. v Digital Transactions,
 
 920 F2d 171, 174 [2d Cir]).
 

 There was conflicting evidence on the point but the trial court chose to credit defendant’s expert who testified that a financial analyst could, based on the public disclosures made by Ashland, reproduce the calculations without access to the internal computer commands which constitute the Alpha software. The court concluded that in view of the ease with
 
 *408
 
 which others could acquire and duplicate the information, Alpha was not a trade secret but a promotional device. Based on this, it determined defendant was not guilty of misappropriation and the Appellate Division affirmed. This finding is supported by evidence in the record and is, therefore, beyond the scope of our review.
 

 Accordingly, the order of the Appellate Division should be affirmed, with costs.
 

 Chief Judge Kaye and Judges Titone, Hancock, Jr., Bellacosa, Smith and Levine concur.
 

 Order affirmed, with costs.