WORLDWIDE SPORT NUTRITIONAL
SUPPLEMENTS, INC., Plaintiff,

v.

FIVE STAR BRANDS,
LLC, Defendant.

No. 99–CV–1192 (TJM).

United States District Court,
N.D. New York.

Oct. 26, 1999.

Heslin & Rothenburg, P.C., Albany, NY (Nicholas Mesiti, Leo M. Loughlin, of counsel), for Plaintiff.

Price, Heneveld, Cooper, Dewitt & Litton, Grand Rapids, MI (Randall G. Litton, Steven L. Underwood, of counsel), Answorth, Sullivan, Tracy, Knauf, Warner and Ruslander, P.C., Albany, NY (Michael J. Murphy, of counsel), for Defendant.

## MEMORANDUM—DECISION & ORDER

McAVOY, Chief Judge.

### I. Background

Plaintiff, Worldwide Sport Nutritional Supplements, Inc. ("Worldwide"), is moving, by Order to Show Cause, for a preliminary injunction to enjoin Defendant, Five Star Brands, LLC ("Five Star") from (1) misappropriating Plaintiff's Trade Secret; and (2) prosecuting a declaratory judgment action filed in Michigan.

### A. Facts

Worldwide approached Five Star in mid 1996 about manufacturing a high protein, low carbohydrate energy bar, using a liquid protein developed by Worldwide. Five Star agreed to manufacture the Pure Protein Bar.

In late 1996 or early 1997, Worldwide sent a promotional brochure to Five Star and other entities promoting various products, including the Pure Protein Bar and the Pure Amino Power protein drink. The

product descriptions state that the products contain "Pure Amino Power Hydrolyzed Gelatin Protein 92%" and "100% Beef Protein" respectively. Richard D. Manus Supp. Dec. ¶¶ 1–4. From this information one could conclude that "92% of the gelatin of the Pure Protein Bar is a beef-based gelatin mixed with glycerine." Fortney Dec. ¶ 33.

Originally, Five Star outsourced the manufacture of the protein base[1] for the Pure Protein Bar to Energy Factors, Inc. ("EFI"). The protein base manufactured by EFI proved to be unstable because it grew mold quickly. A new protein base was formulated. The new base was mixed by Five Star itself rather than by EFI. Thus, at this point, Five Star was privy to all of the ingredients in the Pure Protein Bar.

Worldwide claims that the Pure Protein Bar is unique because the use of a beef-based hydrolyzed gelatin protein mixed with glycerine creates a high protein, low carbohydrate bar that has a pleasing taste and texture. Accordingly, Worldwide claims that the use of the beef-based hydrolyzed Gelatin Protein mixed with glycerine in a high protein, low carbohydrate bar is its trade secret. *See* McCabe Supp. Dec. dated Sept. 10, 1999 ¶ 2. Five Star, however, claims that there is no trade secret and that it, rather than Worldwide, created a workable protein glycerine blend.

The dispute in this action concerns the development of the second protein glycerine base. It is undisputed that the original liquid protein base, made from a beef-based hydrolyzed protein, belongs to Worldwide. Worldwide claims that since "beef base hydrolyzed gelatin protein was used to make the original protein blend prior to Five Star making the same, Five

Star was not the originator of the use of beef based hydrolyzed gelatin protein mixed with glycerine in a high protein low carbohydrate bar." McCabe Supp. Dec. dated Sept. 10, 1999 ¶ 5. Worldwide also claims that it was the entity to originally contact Vyse Gelatin Company regarding the supply of beef-based hydrolyzed gelatin, *id.* ¶ 6, and that after Worldwide instructed Vyse to ship the beef-based protein directly to Five Star it took Five Star multiple attempts to manufacture a suitable bar. *See id.* ¶ 9. David J. McCabe, President of Worldwide, further states that "Five Star acknowledged ... that the new version of the protein base was a confidential proprietary formula of Worldwide, and it agreed not to use it, disclose it, or to manufacture bars for itself or any third parties [using the formula]." *Id.* ¶ 17. Worldwide also provides a letter that states that EFI, the original manufacturer of the Protein Blend, received samples of VEE GEE Hydrolysate Type B Gelatin from Vyse Gelatin in January of 1997. *See* McCabe Dec. dated Sept. 18, 1999, Ex. A.

Contrary to the scenario outline above, Five Star alleges that it, not Worldwide, developed the protein glycerine blend that ultimately led to a marketable high protein, low carbohydrate bar. Documentary evidence shows that representatives of Five Star contacted Vyse Gelatin in April 1997. In fact, at this time, Mr. Ayers, a sales representative at Vyse Gelatin, told Mr. Burton, President of Vyse Gelatin, that Five Star had contacted him and was looking for a suitable protein gelatin for use in a new low carbohydrate, high protein bar. Burton recommended a "low bloom[2] or hydrolysate gelatin," specifically VEE GEE Type V Gelatin and VEE GEE Type B Hydrolysate Gelatin. *See* Burton Dec. ¶ 4. Both Gelatins are beef-based and

---

1. The Pure Amino Power liquid protein was used as the protein base in the initial stage of developing a bar. The use was discontinued because the "liquid protein was found to be an unstable blend, and began to mold." Richard D. Manus Supp. Dec. ¶ 5.

2. Proteins have a number of characteristics, including bloom—the "gelling factor"—relevant to selection for use in food products. McCabe Dec. dated Sept. 18, 1999 ¶ 13.

"low or zero bloom." *Id.* This recommendation was based on both the qualities and cost of the beef-based gelatin. At the time he made this recommendation, Burton was not aware of the protein used in the Worldwide Bar, nor "had [he] ever heard of Worldwide or David McCabe." *Id.* Five–Star began purchasing production quantities of VEE GEE Type B Hydrolysate Gelatin, *id.* ¶ 7, and began experimenting with the gelatin to form a protein bar.

Although there is dispute regarding who contacted Vyse Gelatin, there is no dispute that Five Star performed a number of test runs before it manufactured a suitable bar. Worldwide never actually paid, or offered to pay, for any of Five Star's development efforts. *See* Richard D. Manus Supp. Dec. ¶ 7. According to documentary evidence of a technical consultant to the food industry offered by Five Star, it is common practice in the food industry, that "if a customer wants to own the proprietary rights for the product made by a private label vendor, the customer will pay the vendor specifically for the time and effort necessary to develop the formula." *See* Fortney Dec. ¶ 29.

In January or February of 1999, Worldwide became suspicious that Five Star was manufacturing high protein, low carbohydrate bars using beef-based hydrolyzed protein and glycerine for other customers. Although Five Star denied it was using Worldwide's blend of proteins in other bars, McCabe contacted Vyse Gelatin and requested that Brunet inform him of any orders from Five Star and requested that all "purchase orders should originate from [Worldwide] and sale of the VEE GEE Type B hydrolysate Gelatin should be sold exclusively to Worldwide." *See* Brunet Dec. ¶ 11. Prior to this request, all purchase orders originated with Five Star. McCabe explained that the change in procedure was necessary because "he suspected Five Star was making low carbohydrate, high protein bars for others using 'his gelatin'." Brunet Dec. ¶ 13.

There is no written contract or confidentiality agreement between Five Star and Worldwide regarding the use of beef-based hydrolyzed gelatin protein mixed with glycerine in high protein, low carbohydrates bars. In early 1999, McCabe "sought to have Five Star sign an agreement for them to be Worldwide's exclusive supplier of the Pure Protein bar and to confirm that it would not disclose the proprietary protein blend or manufacture bars with Worldwide's proprietary protein blend for the Pure Protein bar for itself or for third parties." McCabe Dec. ¶ 28. Five Star did not sign this agreement. *Id.*

Worldwide claims that Five Star recognized the protein base was a trade secret insofar as: (1) Five Star agreed (orally) to keep the formula confidential; (2) the bar's label stated "made exclusively for Worldwide"; and (3) there were discussions of Defendant paying Plaintiff a royalty if Five Star manufactured the bars for others.

Worldwide claims it is impossible to determine the beef-based hydrolyzed protein and glycerine mixture from either the ingredient label on the package or through scientific analysis of the bar itself (insofar as you could not determine the grade of the protein or that the protein was beef-based), *see* McCabe Dec. ¶ 20–21, and that competitors have unsuccessfully attempted to manufacture a similar bar using reverse engineering. *Id.* ¶ 22. Five Star disputes this contention and has offered testimony of a technical consultant to the food industry who states that there are specific tests by which the nature of the animal source of a gelatin can be determined; that it is possible to test to determine if hydrolyzed proteins are used; and that "[a]pproximate quantitative testing can ... be conducted if a list of ingredients on the product wrapper is available.... A comparison of this list with laboratory results can be used to identify, with reasonable accuracy, the percentage of the ingredients in most cases." Fortney Dec. ¶¶ 21–30. Moreover, Fortney's declaration indicated that hydrolyzed

gelatins are commonly used in foods. *Id.* ¶ 19. Thus, according to Five Star, scientific testing could show both that the gelatin used in the Pure Protein Bar is beef-based and that it is hydrolyzed. Five Star also contends that Beef-based gelatin and hydrolyzed gelatin are commonly used and typically recommended for use in food products. *See* Brunet Dec. ¶¶ 4–6; Fortney Dec. ¶ 19. In fact, Five Star allegedly manufactured performance bars for Missing Link, Inc. using a protein powder blend that included beef protein and glycerine in 1992 and 1993. *See* Roper Supp. Dec. ¶ 1. Since 1997, Five Star has also manufactured bars using hydrolyzed protein, "which was the same ingredient listing for the Worldwide bar using the alleged trade secret of a beef-based gelatin mixed with glycerin." *Id.* ¶ 2. These were not, however, high protein, low carbohydrate bars.

Five Star currently produces six low carbohydrate, high protein bars containing VEE GEE Type B Hydrolysate Gelatin sold by Vyse Gelatin Company blended with glycerine. *See* George Manus Dec. ¶¶ 8–9. Five Star is not, however, manufacturing bars that have a lower carbohydrate content than those it manufactures for Worldwide, *see id.* ¶ 7, or bars that use the Pure Amino Liquid protein blend originally provided by Worldwide. *Id.* ¶ 10.

### B. Procedural History

Plaintiff brought this motion for a preliminary injunction by Order to Show Cause which was granted on September 7, 1999. The Court heard oral argument on September 13, 1999. The parties entered into settlement negotiations but subsequently advised the Court that they could not reach a settlement.

## II. Discussion

### A. Choice of Law

 The parties did not address the issue of choice of law. Because the locus of the alleged tort, misappropriation of a trade secret, is Michigan rather than New York, it is not self-evident that New York law is applicable. *See Softel Inc. v. Dragon Medical and Scientific Communications, Inc.,* 118 F.3d 955. 967–68 (2d Cir. 1997), *cert. denied,* 523 U.S. 1020, 118 S.Ct. 1300, 140 L.Ed.2d 466 (1998). In choosing the applicable state law, courts employ the choice of law rules of the forum state, in this case New York. *See, e.g., Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.,* 933 F.2d 131, 137 (2d Cir.1991) (citing *Krauss v. Manhattan Life Ins. Co.,* 643 F.2d 98, 100 (2d Cir.1981)). New York courts apply an "interest analysis" to torts cases, under which the law of the jurisdiction having the greatest interest in the litigation controls. *See Passalacqua Builders,* 933 F.2d at 137 (citing *Intercontinental Planning, Ltd. v. Daystrom,* Inc., 24 N.Y.2d 372, 382, 300 N.Y.S.2d 817, 248 N.E.2d 576 (1969)); *Global Financial Corp. v. Triarc Corp.,* 93 N.Y.2d 525, 529, 693 N.Y.S.2d 479, 715 N.E.2d 482 (1999); *Schultz v. Boy Scouts of America,* 65 N.Y.2d 189, 491 N.Y.S.2d 90, 480 N.E.2d 679 (1985). Pursuant to this interest analysis, "when the domiciles of the parties differ, the location of the injury determines the governing substantive law absent special circumstances." *Gray v. Busch Entertainment Corp.,* 886 F.2d 14, 15 (2d Cir.1989) (per curiam); *see also Bader v. Purdom,* 841 F.2d 38, 40 (2d Cir.1988) ("As a general rule, New York courts resolve true conflicts in tort cases by applying the law of the place of injury, unless 'special circumstances' warrant a departure for the lex loci delicti rule."). Moreover, "[a]s part of the interest analysis, the New York Court of Appeals has distinguished between rules regulating conduct and rules governing loss allocation. Generally, when the laws in conflict are conduct regulating, the law of the locus jurisdiction applies." *AroChem Int'l, Inc. v. Buirkle,* 968 F.2d 266, 270 (2d Cir.1992) (citing *Schultz,* 65 N.Y.2d at 198, 491 N.Y.S.2d 90, 480 N.E.2d 679).

Defendant Five–Star's principal place of business is in Michigan as is the factory where Pure Protein Bars were manufactured. Thus, the alleged misappropriation occurred in Michigan. Worldwide is a New York Corporation and has a warehouse facility in New York. The law with respect to trade secret misappropriation is similar in New York and Michigan, both states rely on the standards set forth in the Restatement of Torts, *see Utilase Inc. v. Williamson*, 188 F.3d 510, 1999 WL 717969, at 5 (6th Cir. Sept.10, 1999); *Ashland Management Inc. v. Janien*, 82 N.Y.2d 395, 407, 604 N.Y.S.2d ·912, 624 N.E.2d 1007 (1993)), it is not necessary, at this juncture, to determine which law applies.

### B. Standard for Preliminary Injunction·

■ To obtain a preliminary injunction, Plaintiff must demonstrate (1) that it will suffer irreparable harm without injunctive relief, and (2) either (a) a likelihood of success on the merits of its case or (b) sufficiently serious questions going to the merits to make them fair ground for litigation and the balance of hardships tipping decidedly in its favor. *See North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, 43 (2d Cir.1999) (quoting *Otokoyama Co. v. Wine of Japan Import, Inc.*, 175 F.3d 266, 270 (2d Cir.1999)); *Beal v. Stern*, 184 F.3d 117, 122 (2d Cir.1999) (citing *Bery ·v. City of New York*, 97 F.3d 689, 693–94 (2d Cir.1996), *cert. denied*, 520 U.S. 1251, 117 S.Ct. 2408, 138 L.Ed.2d 174 (1997)).

### 1. Likelihood of Success on the Merits

Because there is a rebuttable presumption of irreparable harm which attaches to trade secret misappropriation, the Court will first consider whether Worldwide has shown a likelihood of success on the merits on this claim. *See, e.g., FMC Corp. v.*

*Taiwan Tainan Giant Indus. Co., Ltd.*, 730 F.2d 61, 63 (2d Cir.1984).

■ To succeed on a claim for the misappropriation of trade secrets under New York and Michigan law, a party must demonstrate: (1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means. *See Haber*, 188 F.3d at 40 (2d Cir.1999)(citing *Hudson Hotels Corp. v. Choice Hotels Int'l*, 995 F.2d 1173, 1176 (2d Cir.1993)(internal citations omitted)).

■ "[A] trade secret is 'any formula, pattern, device or compilation of information which is used in one's business, and which gives [the owner] an opportunity to obtain an advantage over competitors who do not know or use it.'" *See Softel*, 118 F.3d at 968 (quoting Restatement of Torts § 757 cmt. b (1939)); *see also Ashland Management Inc. v. Janien*, 82 N.Y.2d 395, 407, 604 N.Y.S.2d 912, 624 N.E.2d 1007 (1993) (quoting the Restatement of Torts). New York and Michigan courts have considered the following factors in determining whether a trade secret exists: (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *See, e.g., Haber*, 188 F.3d at 43; *Ashland Management*, 82 N.Y.2d at 407, 604 N.Y.S.2d 912, 624 N.E.2d 1007 (quoting Restatement of Torts § 757 cmt. b) (internal quotation marks and brackets omitted).[3] ·

**3.** The standard in the Sixth Circuit is similar. To succeed on a claim for misappropriation of a trade secret, a plaintiff must prove the following elements by a preponderance of the evidence: 1) the existence of a trade secret; 2) its acquisition in confidence; and 3) the

Looking to the factors considered in determining whether a trade secret exists, the evidence before the Court tends to negate Worldwide's claim that use of beef-based hydrolyzed gelatin protein mixed with glycerine in a high protein, low carbohydrate bar is a trade secret.

First, Five Star has presented evidence which suggests, *inter alia*, that Bariatrix, a Canadian Company which makes and sells high protein, low carbohydrate protein food bars using a gelatin provided by Vyse in combination with glycerine, *see* George Manus Dec. ¶¶ 18–19, and other food companies manufacture high protein, low carbohydrate bars using blends of hydrolyzed gelatin. *See id.* ¶¶ 15–16. Five Star has also presented evidence that it has produced protein bars using a beef-based protein, *see* Roper Supp. Dec. ¶¶ 1–2, and that VEE GEE Type B Hydrolysate Gelatin is used by others in the health food industry. *See* Richard D. Manus Dec. ¶ 21.

Additionally, the evidence before the Court suggests that the use of beef-based gelatin is common in the industry as is the use of hydrolyzed gelatin in combination with glycerine. Moreover, the President of Vyse Gelatin stated that because of cost and other factors beef-based gelatin is commonly recommended for use in food products. This indicates that the gelatin portion of the purported trade secret would be easily obtainable through a simple inquiry process and that its use is commonly known inside the industry.

Although the evidence suggests that Worldwide has taken steps to protect the secrecy of the specific composition of the initial "protein blend," this evidence is of limited value to this motion because Worldwide does not claim that the protein blend alone is a trade secret. Rather, it claims that the use of beef-based hydrolyzed gelatin mixed with glycerine in a high protein, low carbohydrate bar is proprietary. Five Star has provided the Court with a brochure distributed in 1996 by Worldwide to manufacturers. The description of ingredients in the Pure Protein Bar and liquid Pure Amino Power Drink provided in this brochure include, respectively, the ingredients of "Pure Amino Power Hydrolyzed Gelatin Protein 92%" and "100% Beef Protein." Supp. Dec. of

---

defendant's unauthorized use of it. *Utilase,* 188 F.3d 510, 1999 WL 717969, *6 (citing *Rothschild v. Ford Motor Co.,* 2 F.Supp.2d 941, 950 (E.D.Mich.1998) (internal citations omitted)). The Michigan courts have defined "trade secret" as that which "consists of any valuable formula, pattern, device, process, or other information that is used in one's business and gives the possessor a competitive advantage over those who do not know or use the information." *Rothschild,* 2 F.Supp.2d at 950 n. 12 (quoting *Kubik, Inc. v. Hull,* 56 Mich.App. 335, 224 N.W.2d 80 (1974)). Like the New York courts, Michigan courts look to the factors set forth in the Restatement of Torts, which are outlined above, as a guideline for determining whether particular information is a trade secret. *See, e.g., Hayes–Albion v. Kuberski,* 421 Mich. 170, 364 N.W.2d 609, 614 (1984) (quoting The Restatement of Torts, § 757, Cmt. b). Michigan courts also consider whether "the information [composing a trade secret] is embodied or capable of being embodied in concrete form," *Manos v. Melton,* 358 Mich. 500, 100 N.W.2d 235, 238 (1960), and require that an alleged trade secret be identified "clearly, unambigu-

ously, and with specificity." *Shatterproof Glass Corp. v. Guardian, Glass Co.,* 322 F.Supp. 854, 867 (E.D.Mich.1970), *aff'd,* 462 F.2d 1115 (6th Cir.), *cert. denied,* 409 U.S. 1039, 93 S.Ct. 518, 34 L.Ed.2d 487 (1972). Like New York courts, Michigan courts require the plaintiff to present evidence that sufficient measures have been taken to guard the secrecy of the information and preserve its confidentiality. Further guidance suggests that "[s]uch measures generally include an express agreement, disclosure to another in confidence or utilization of security precautions. The term trade secret does not encompass information which is readily ascertainable." *Utilase,* 188 F.3d 510, 1999 WL 717969, *6. As will be discussed above, Worldwide has not presented sufficient evidence to establish a trade secret exists using the factors outlined in the Restatement. This coupled with Michigan's heightened requirement that measures, like a written agreement, be taken to protect a trade secret, suggest that the Plaintiff has not provided sufficient evidence to establish the existence of a trade secret under Michigan's law.

Richard D. Manus Ex. H. Moreover, Five Star and Worldwide have never entered into any sort of confidentiality agreement. Accordingly, the evidence before this Court indicates that Worldwide did not maintain, or attempt to maintain secrecy of the use of a beef-based hydrolyzed gelatin mixed with glycerine in a high protein low carbohydrate bar. Thus, the second third factors in the Restatement test weigh against finding a trade secret.

The fourth factor, the value of the information to competitors, is similarly dependent on the breadth of the claimed trade secret. Again, the evidence discussed above suggests that the use of a hydrolyzed beef protein mixed with glycerine in a high protein, low carbohydrate bar is common. Thus, the evidence indicates that the information claimed to be a trade secret is not independently valuable.

The fifth factor, the amount of money or effort expended in developing the trade secret, is clearly disputed. Although Worldwide claims that it created the beef-based protein and glycerine mix used in its bars, it has not provided evidence to adequately support this claim. The contention is only supported by declarations of Worldwide's President and CFO.[4] Five Star, on the other hand, provides declarations of its own employees as well as declarations of the President and a Sales Representative of Vyse Gelatin, who all recall

Vyse Gelatin worked with Five Star to determine which gelatin would be suitable for a high protein, low carbohydrate bar. *See* Dec. of Brunet; Dec. Ayres; Dec. of George Manus; Dec. of Richard D. Manus. This declaration testimony indicates that Five Star, not Worldwide, obtained the gelatin component of the trade secret.[5] Further evidence supplied by these individuals suggests that Five Star, not Worldwide, conducted the testing and experimentation necessary to create the final protein bar. Moreover, Five Star has presented evidence that it is common industry practice for customers who "want[ ] to own proprietary rights for the product made by a private label vendor... [to] pay the vendor specifically for the time and effort necessary to develop the formula." Fortney Dec. ¶ 29. Worldwide did not pay Five Star for its efforts. Again, the breadth of the purported trade secret is integral to this analysis. The evidence before the Court shows that Five Star obtained the gelatin component of the trade secret and performed the testing necessary to develop a marketable bar. This record does not support a finding that Worldwide will be able to show it independently developed the second formula.[6]

Moreover, the evidence before the Court indicates that the sixth factor, the ease or difficulty with which someone can reproduce a trade secret, suggests that the use of beef-based hydrolyzed protein and

---

4. Worldwide provided a declaration of Harry Baker, formerly an independent sales representative for Vyse Gelatin Company, dated September 11, 1999. This declaration supported Worldwide's claims that it initiated contact with Vyse Gelatin to find a suitable gelatin for use in the Pure Protein Bar. In a subsequent declaration, however, Baker states, *inter alia*, that (1) he does not recall being interviewed regarding statements in the previous declaration; (2) he only agreed to sign a declaration stating that he was an independent sales representative for Vyse Gelatin; (3) he does not recollect reviewing the contents of his previous declaration prior to signing it; (4) he has no independent recollection of when he visited Worldwide's facilities; and (5) he has no independent recollection of McCabe mentioning the Pure Protein Bar to

him or discussing the shipment of beef-based hydrolyzed protein to Five Star. Supp. Dec. of Baker dated Sept. 16, 1999.

5. Worldwide provides a letter from Vyse Gelatin that indicates that Worldwide received samples of beef-based gelatin prior to its partnership with Five Star. This letter, in and of itself, does not establish that Worldwide, not Five Star, initiated the relationship with Vyse Gelatin that eventually led to the creation of a marketable protein bar. In fact, this letter tends to support Burton's statements that the beef-based gelatin used in the Pure Protein Bar is of the type that is commonly recommended for use in food products.

6. It is undisputed that Worldwide developed the first formula.

glycerine in a high protein, low carbohydrate bar is not a trade secret. Worldwide contends that its protein bars cannot be reverse engineered. Five Star, however, presents documentary evidence from an independent technical consultant in the food industry, Cecil Fortney, that negates the claim that the bar cannot be reversed engineered, at least to the extent that scientific testing can be used to identify that the bar contains beef-based hydrolyzed protein, low carbohydrates, and high protein (the latter two ingredients are self-evident from the nutritional information). Mr. Fortney stated that "[g]elatins are commonly used in food products and, in fact, specific tests exist by which the nature of the animal source of gelatin can be identified." Fortney Dec. ¶ 21. Fortney also stated that it is possible to test to determine if hydrolyzed proteins are used and that, in most cases, "approximate quantitative testing" using a list of ingredients on the product wrapper in combination with laboratory tests will lead to an identification "with reasonable accuracy" of "the percentage of ingredients." *Id.* ¶¶ 23–25.

Looking to the evidentiary record as a whole, this Court cannot say that Plaintiff has shown a likelihood of success on the merits, or a substantial question regarding the merits, on its trade secret claim.

### 2. Irreparable Harm

■ The showing of irreparable harm is the "single most important prerequisite for the issuance of a preliminary injunction." *Cortland Line Co. v. Vincent,* 1998 WL 542332 (N.D.N.Y. Aug.18, 1998) (quoting *Bell & Howell v. Masel Supply Co.,* 719 F.2d 42, 45 (2d Cir.1983)); *see also Reuters Ltd. v. United Press Int'l, Inc.,* 903 F.2d 904, 907 (2d Cir.1990). It is not sufficient to show a mere possibility of harm to support a preliminary injunction, the harm must be imminent. Therefore, Worldwide must show it is likely to suffer irreparable harm if equitable relief is denied. *See, e.g., JSG Trading Corp. v.*

*Tray–Wrap, Inc.,* 917 F.2d 75, 79 (2d Cir. 1990); *In re Feit & Drexler, Inc.,* 760 F.2d 406, 415 (2d Cir.1985). Moreover, a preliminary injunction will not be granted if the movant can be adequately compensated by money damages. *See Borey v. Nat'l Union Fire Ins. Co.,* 934 F.2d 30, 34 (2d Cir.1991); *Loveridge v. Pendleton Woolen Mills, Inc.,* 788 F.2d 914, 917–18 (2d Cir. 1986).

■ Irreparable harm is presumed if a trade secret has been misappropriated because a trade secret, once lost, is lost forever; its loss cannot be measured in money damages. *See FMC* 730 F.2d at 63; *Ivy Mar Co. v. C.R. Seasons Ltd.,* 907 F.Supp. 547, 566 (E.D.N.Y.1995). Worldwide cannot take advantage of this presumption, however, because the evidence presented does not establish a likelihood that Five Star has misappropriated its trade secret. Both the existence of a trade secret and its misappropriation are questions of fact on which Plaintiff has the burden of proof. *See, e.g., Defiance Button Mach. Co. v. C & C Metal Products Corp.,* 759 F.2d 1053, 1063 (2d Cir.), *cert. denied,* 474 U.S. 844, 106 S.Ct. 131, 88 L.Ed.2d 108,(1985); *A.F.A. Tours, Inc., v. Whitchurch,* 937 F.2d 82, (2d Cir.1991) ("existence of a trade secret is a question of fact for the determination of the trier of fact, secrecy being a basic element") (internal quotations and citations omitted).

■ Defendant contends that even if Plaintiff had provided sufficient evidence to establish trade secret misappropriation, such that there is a presumption of irreparable harm, the timing of Worldwide's motion for preliminary injunction precludes such a finding. *See, e.g., Andersen Consulting LLP v. American Management Systems, Inc.,* 1995 WL 510042, *3 (S.D.N.Y. Aug.28, 1995). Because "[p]reliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiff['s] rights[, d]elay in seeking enforcement of those rights ... tends to indicate at least a reduced need for such drastic,

speedy action." *Id.* at 276. Although this delay "may not warrant the denial of the ultimate relief [sought], it may 'standing alone[ ] . . . preclude the granting of preliminary injunctive relief.' " *Tough Traveler, Ltd. v. Outbound Prod.*, 60 F.3d 964, 968 (2d Cir.1995) (citing *Majorica, S.A. v. R.H. Macy & Co.*, 762 F.2d 7, 8 (2d Cir. 1985)), *cert. denied*, ⎯ U.S. ⎯, 119 S.Ct. 2394, 144 L.Ed.2d 795 (1999). The Second Circuit has held that "failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276–77 (2d Cir.1985).

 The facts in this case indicate that Worldwide had suspicions that Five Star was manufacturing high protein, low carbohydrate protein bars using beef-based protein mixed with glycerine, Worldwide's alleged trade secret, for customers other than Worldwide in January 1999. *See* McCabe Dec. ¶ 29. Although Five Star denied that it was making bars using Worldwide's protein blend and Worldwide claims that it was not aware of the threat until Five Star threatened to "flood the market" with protein bars identical to Worldwide's in July 1999, the facts before the Court suggest that Worldwide recognized that Five Star may be using a protein blend fitting the description of Worldwide's purported trade secret in January 1999.[7] First, Worldwide knew, or should have known, that Five Star had been manufacturing a protein bar for Premier Nutrition since 1997, with a label stating it was made from "hydrolyzed protein" rather than whey or milk protein. This indicates that Worldwide was aware that Five Star might be using beef-based hydrolyzed

proteins in bars manufactured for other customers. *See* Roper Dec. ¶ 2, McCabe Supp. Dec. ¶ 30. Second, Five Star presented a declaration of an independent party who stated that McCabe suspected Five Star was using "his gelatin" in protein bars in February 1999. *See* Brunet Dec. ¶ 13. Third, in early 1999, Worldwide sought to have Five Star sign an agreement confirming that it would not disclose the protein blend used in Worldwide's bars or manufacture bars using this blend for third parties. This also supports a finding that Worldwide was aware that Five Star was using its alleged trade secret at this time. In fact, McCabe stated Five Star's refusal to sign this agreement "heighten[ed] his suspicions." McCabe Dec. ¶ 28. Finally, in late 1998 or early 1999 McCabe contacted Vyse Gelatin to ask about Five Star's orders; asked to be informed when Five Star placed orders and of the amount of these orders; and asked that the VEE GEE Hydrolysate Gelatin used in the Pure Protein Bars be sold exclusively to Worldwide. *See* Burton Dec. ¶¶ 10–12. McCabe indicated that the change in procedure resulted from suspicions that "Five Star was making low carbohydrate, high protein bars for others using 'his gelatin'." *Id.* ¶ 13. In total, these facts indicate that Worldwide was aware that Five Star may have been manufacturing bars using its purported trade secret in early 1999.

The Complaint in this action was not filed until July 30, 1999 and the Motion for Preliminary Injunction, brought by Order to Show Cause, was not filed until September 3, 1999, at least seven months after Worldwide was likely aware that Five Star was manufacturing low carbohydrate, high protein bars for customers other than Worldwide and was "very suspicious" that these bars were manufactured using Plain-

---

7. Worldwide's purported trade secret is extremely broad and encompasses any high protein, low carbohydrate bar made with a beef-based hydrolyzed gelatin mixed with glycerine. The trade secret is not limited to the exact composition (either specific ingredients or grams of carbohydrate). Because of this, Five Star did not have to manufacture bars

identical to Plaintiff's to infringe upon the purported trade secret. Thus, Worldwide's claim that despite the fact it suspected Five Star was manufacturing high protein, low carbohydrate bars using its trade secret it was not faced with irreparable harm until Five Star threatened to manufacture identical bars, is unpersuasive.

tiff's alleged trade secret. Barring extreme extenuating circumstances (i.e., settlement negotiations), which have not been presented here, the lengthy delay between Worldwide's learning of the possible misappropriation and filing the Complaint and Order to Show Cause, is enough to defeat Plaintiff's motion for a preliminary injunction. *See Tough Traveler,* 60 F.3d at 968 (internal citation omitted),; *Citibank, N.A.,* 756 F.2d at 276–77; *Vincent,* 1998 WL 542332 at *5; *Ivy Mar Co.,* 907 F.Supp. at 563 (citing *Century Time Ltd. v. Interchron Ltd.,* 729 F.Supp. 366, 369 (S.D.N.Y.1990) (six month delay in seeking preliminary injunction in infringement and trade dress case barred relief sought); *Lanvin Inc. v. Colonia, Inc.,* 739 F.Supp. 182, 192 (S.D.N.Y.1990) (delay, even if it does not rise to the level of laches, demonstrates lack of need for speedy action); *The Comic Strip v. Fox Television Stations, Inc.,* 710 F.Supp. 976, 981 (S.D.N.Y. 1989) (seven month delay precluded injunctive relief); *Gillette Co. v. Ed Pinaud, Inc.,* 178 F.Supp. 618, 622 (S.D.N.Y.1959) (six month delay indicated lack of urgency requiring preliminary relief)). *But see Kraft Gen'l Foods, Inc. v. Allied Old English, Inc.,* 831 F.Supp. 123, 136 n. 12 (S.D.N.Y.1993) (movant "should not be penalized for any delay arising out of settlement efforts"); *Computer Associates Intern., Inc. v. Bryan,* 784 F.Supp. 982, 987 (E.D.N.Y.1992) (excusing delay where plaintiffs used time prior to seeking preliminary injunction to conduct extensive investigation to gather necessary facts required to support complex action).

### A. Injunction of Michigan Action

■ On August 4, 1999, Five Star filed a motion for a declaratory judgment in Michigan. Worldwide filed this action on July 30, 1999. Worldwide moves to enjoin the Michigan action on the bases of the "first filed" rule. The "first filed" rule states that "where an action is brought in one federal district court and a later action embracing the same issue is brought in another federal court, the first court has jurisdiction to enjoin the prosecution of the second action," *See City of New York v. Exxon Corp.,* 932 F.2d 1020, 1025 (2d Cir. 1991) (quoting *Meeropol v. Nizer,* 505 F.2d 232, 235 (2d Cir.1974)), unless "there are special circumstances which justify giving priority to the second" action. *Id.* (quoting *William Gluckin & Co. v. Int'l Playtex Corp.,* 407 F.2d 177, 178 (2d Cir.1969) (citations omitted)). Worldwide's action was the first in time.

■ Five Star urges this Court not only to deny Worldwide's motion to enjoin the Michigan action, but to transfer this action to Michigan under 28 U.S.C. § 1404(a), under the principles of *forum non conviens.* However, Five Star has not made a motion on this basis, as required by 28 U.S.C. § 1404(b), and thus, the issue is not properly before the Court. At this point, it would be improper for the Court to transfer this action. However, should Five Star be properly served with the Complaint within the requisite time period, it may file a motion to dismiss, or a motion for change of venue, based on *forum non conviens.*

Five Star's action for a declaratory judgment is based on the same facts and controversies as the action before this Court. When two actions involving the same parties and embracing the same issues are brought in different federal district courts, "the court in the first-filed action has the power to enjoin the parties from proceeding in later-filed action, and indeed, should do so absent showing of special circumstances that would give priority to later-filed action." *Toy Biz, Inc. v. Centuri Corp.,* 990 F.Supp. 328 (S.D.N.Y.1998); *see also Meeropol v. Nizer,* 505 F.2d 232 (2d Cir.1974.). Moreover, the interests of judicial economy support the general finding that two courts should not expend energy on the same matter. Therefore, because Worldwide's action was filed first in time, Worldwide's motion for a preliminary injunction enjoining Five Star from prosecuting the Michigan action is granted.

**36**

### III. Conclusion

For the foregoing reasons, Five Star is enjoined from prosecuting the declaratory judgment action filed in Michigan. Plaintiff's motion is in all other respects DENIED.

**IT IS SO ORDERED.**