■ AMCO INTERNATIONAL, INC., et al., Respondents-Appellants, v LONG ISLAND RAILROAD COMPANY, Appellant-Respondent. [754 NYS2d 655] —In an action, inter alia, to recover damages for the discharge of petroleum pursuant to Navigation Law article 12, the defendant appeals from a judgment of the Supreme Court, Suffolk County (Hall, J.), entered July 26, 2001, which, upon the granting of the plaintiffs' motion for partial summary judgment on the issue of liability and after a nonjury trial on the issue of damages, is in favor of the plaintiffs and against it in the principal sum of $1,400,679.61, including the principal sums of $480,000 for remediation costs, $760,000 for lost profits, and $160,679.61 for cleanup costs, plus interest, costs and disbursements, and the plaintiffs cross-appeal from stated portions of the same judgment which, inter alia, limited the award of an attorney's fee and expenses included in the cleanup costs.

Ordered that the judgment is modified by deleting the provision thereof awarding interest on the damages for remediation costs, and by deleting the provision thereof awarding cleanup costs in the principal sum of $160,679.61; as so modified, the judgment is affirmed, without costs or disbursements, and the matter is remitted to the Supreme Court, Suffolk County, for a recalculation of damages for cleanup costs.

In April 1994 a locomotive owned and operated by the defendant struck an object on its tracks which caused the locomotive's fuel tank to rupture and leak. The defendant moved the locomotive onto an adjacent rail spur located on the plaintiffs' property where the tank continued to leak approximately 800 to 900 gallons of diesel fuel. The defendant immediately notified the New York State Department of Environmental Conservation (hereinafter the DEC) and the DEC directed the defendant to proceed with a cleanup of the site within three days.

Thereafter, the defendant hired an environmental consulting firm to determine the extent of the spill and devise a plan for its removal. By January 1997, however, the contaminated soil had not been removed. The plaintiffs retained an attorney and their own environmental expert in an effort to facilitate negotiations with the defendant to accomplish the cleanup. When those negotiations proved unsuccessful, the plaintiff commenced this action in April 1997.

The vast majority of the plaintiffs' business involves the custom extrusion and sale, or repackaging and distribution of, high quality nonprime plastic scrap materials to customers who manufacture various plastic products. Until 1997 the plaintiffs purchased all of the high quality nonprime scrap material manufactured by Chevron Phillips Chemical Company (hereinafter Chevron), which delivered most of the scrap material in railcars to the plaintiffs' private rail spur, utilizing the defendant's main track. The plaintiffs would store the material in Chevron's railcars until it was used, returning the railcars to Chevron as they were emptied.

In or about July 1997 Chevron notified the plaintiffs that it intended to increase the nonprime scrap output, and required an immediate return of the emptied railcars for storage purposes. It was also Chevron's intention to sell its increased output to the plaintiffs. Although the plaintiffs wanted to install five silos on its property near the rail spur to store the scrap material after its delivery and return the railcars more quickly to Chevron, it did not do so upon representations from the defendant that it would not be able to move in the necessary equipment to perform the excavation and remediation of the contaminated soil if the silos were placed on the property near the rail spurs. It was also apparent that any excavation would include temporary removal of the rail spur to clean the soil under the spur. Because the plaintiffs could not accommodate Chevron's needs, Chevron began selling its nonprime scrap materials to other customers in July 1997, and the plaintiffs sales declined significantly from that point.

In 1999 testing was performed by both the defendant's and the plaintiffs' environmental experts. Although the contamination had dissipated through natural attenuation, it still existed within the spill area. While the defendant had represented that at the conclusion of the cleanup operation, the plaintiffs' property would be returned to its pre-spill condition, the main thrust of its theory at trial was that the natural process of attenuation since 1994 had dissipated the contamination so that the level of any harmful individual components of diesel fuel

existing in the soil was below DEC standards, and thus, no remediation was necessary. In part, the defendant relied upon evidence which showed that during the attenuation process the contamination migrated to greater depths in the soil toward the groundwater table where it further dissipated. The plaintiffs, however, introduced expert evidence which indicated that regardless of the presence of low levels of specifically-identified individual components of diesel fuel within the spill area, there were still unacceptable levels of total petroleum hydrocarbons, the overall measure of identified and unidentified components of diesel fuel, existing in the soil which required remediation to restore the property to its pre-spill condition. The Supreme Court credited the testimony of the plaintiffs' expert, thus determining that the soil was contaminated and that it must be restored to its pre-spill condition pursuant to the mandate of the Navigation Law.

Pursuant to the Navigation Law, any person who has discharged petroleum is strictly liable for "all cleanup and removal costs and all direct and indirect damages, no matter by whom sustained" (Navigation Law § 181 [1]). The purpose of the statute is, inter alia, to require the prompt cleanup and removal of oil and fuel discharge, to minimize damage to the environment, to restore the environment to its "pre-spill condition" and to compensate those damaged by such discharge (*see* 6 NYCRR 611.6 [a]; Navigation Law §§ 170, 171). The Supreme Court providently exercised its discretion in crediting the testimony of the plaintiffs' environmental expert, which was based on evidence in the record, that portions of the spill area were still contaminated. The court also properly required restoration of the area to its pre-spill condition. Further, the evidence supports the Supreme Court's award of damages in the sum of $480,000 for the cost of remediation. The Supreme Court, however, erred in awarding prejudgment interest since the plaintiffs had not yet expended the funds for remediation and had not, therefore, been deprived of the use of those funds (*cf. Fiorello v Raheb,* 271 AD2d 402; *155 Henry Owners Corp. v Lovlyn Realty Co.,* 231 AD2d 559).

Contrary to the defendant's contention, the Supreme Court properly awarded lost profits to the plaintiffs. The evidence presented at trial indicated that, based upon, inter alia, prior sales to existing clientele, the profits which could be anticipated between 1998 and 2000 were reasonably certain (*see Ashland Mgt. v Janien,* 82 NY2d 395, 403-406; *Greasy Spoon v Jefferson Towers,* 75 NY2d 792, 795-796).

Since an injured party may recover indirect damages,

consisting of all costs associated with the cleanup and removal of a discharge (*see* Navigation Law § 172 [5]; § 181 [2], [5]), the Supreme Court should have awarded the plaintiffs their litigation costs (*see Strand v Neglia,* 232 AD2d 907; *State of New York v Tartan Oil Corp.,* 219 AD2d 111, 116; *compare Gettner v Getty Oil Co.,* 266 AD2d 342 [declining to award litigation expenses based upon provisions of the parties' lease which specifically disallowed such expenses]). Under the facts of this case, the costs incurred during the litigation were the result of the defendant's extended delay in cleaning the contamination, and its recalcitrance in committing to a plan of action which would restore the plaintiffs' property to its pre-spill condition while maintaining a minimum disruption of the plaintiffs' business, thus necessitating the litigation and its attendant costs. Consequently, the plaintiffs are entitled to recover their attorney's fees and their expert fees, except those expended for a separate tax certiorari proceeding, and except the fees expended for their appraiser, recovery for which is not warranted under the circumstances. The matter is therefore remitted to the Supreme Court, Suffolk County, for a recalculation of the damages awarded for cleanup costs.

Contrary to the plaintiffs' contention, the Supreme Court properly declined to award damages for the alleged permanently diminished value of their property due to the stigma of contamination since the evidence did not support such an award (*see Putnam v State of New York,* 223 AD2d 872).

The defendant's remaining contentions are without merit. Altman, J.P., Smith, H. Miller and Mastro, JJ., concur.